UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

MATTHEW JENNINGS,

        Petitioner,

    v.

D.L. RUNNELS, WARDEN,

        Respondent.

_____/

No. C 01-3751 PJH

**ORDER RE: PETITION FOR
WRIT OF HABEAS CORPUS**

Before the court is the petition for writ of habeas corpus pursuant to 28 U.S.C. §
2254, filed by state prisoner, Matthew Jennings ("Jennings"), who is currently incarcerated
at High Desert State Prison in Susanville, California. Having reviewed the parties' papers,
the record, and having carefully considered their arguments and the relevant legal
authorities, the court hereby GRANTS IN PART AND DENIES IN PART the petition.

**BACKGROUND**

**I.    Procedural Background**

   On May 8, 1992, Jennings was charged along with three other codefendants,
Danny Silveria, Chris Spencer, and John Travis,[1] in the Santa Clara County Superior Court
with the murder of James Madden ("Madden") under California Penal Code § 187, and with
several special circumstances, including lying in wait (California Penal Code §
190.2(a)(15)); robbery (California Penal Code § 190.2(a)(17)); and burglary (California

_____

[1]There was a fifth participant in the crimes, Troy Rackley. The record is unclear
regarding the reason, but it appears that Rackley was charged and prosecuted separately from
Jennings, Silveria, Spencer, and Travis due to Rackley's age.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

Penal Code § 190.2(a)(17)).[2]  Jennings was also charged with two counts of robbery under California Penal Code § 211, and two counts of burglary under California Penal Code § 459.[3]

The state did not seek the death penalty for Jennings, as it did for his codefendants, and Jennings was tried separately.[4]  On April 8, 1997, while on trial on all charges, Jennings pleaded guilty to one count of robbery and one count of burglary, both of which pertained to incidents unrelated to Madden's murder.  On May 5, 1997, a jury convicted Jennings of the remaining robbery and burglary counts, and also convicted him of murder.[5]  It found the special circumstances of burglary, robbery, and lying in wait to be true.

On May 30, 1997, the state trial court sentenced Jennings to life without parole on the murder count, along with a consecutive five-year and eight-month sentence on the burglary and robbery counts to which Jennings pleaded guilty.  The court stayed sentence on the other burglary and robbery counts related to Madden's murder.

Jennings appealed, and the California Court of Appeal affirmed his convictions on May 14, 1999.  However, on August 25, 1999, the California Supreme Court granted review, and on February 28, 2001, remanded the case to the California Court of Appeal for reconsideration of its decision in light of the United States Supreme Court's intervening decision in *Lilly v. Virginia*, 527 U.S. 116 (1999).  On April 11, 2001, the California Court of Appeal vacated its May 14, 1999 opinion, and, after considering *Lilly*, issued a subsequent

---

[2]The burglary and robbery special circumstances are referred to as the "felony murder special circumstances."

[3]One of the robbery charges and one of the burglary charges pertained to unrelated events that occurred on January 24, 1991.  Jennings was charged along with Silveria for the burglary of the Sportsmen's Supply Store, along with the robbery of Ramsis Youssef.

[4]All three of Jennings' codefendants were convicted and received the death penalty. According to the state, all of the defendants agreed that the fifth participant, Troy Rackley, was the least active and the youngest coconspirator.  In separate proceedings, Rackley received a sentence of twenty-five years to life.

[5]The state presented several theories of first degree murder to the jury, including first degree felony murder, the one that it emphasized to the jury in its closing argument was the easiest route for the jury to take in its deliberations.  The jury's verdict does not specify under which theory it convicted Jennings.

**United States District Court**
For the Northern District of California

1  opinion affirming Jennings' convictions.  Jennings again sought review before the California

2  Supreme Court, which denied review on July 25, 2001.

3      Jennings filed the instant federal habeas petition pro se on October 4, 2001, which

4  was fully briefed when Jennings filed his traverse on November 18, 2002.  However,

5  following the United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S.

6  36 (2004), this court stayed Jennings' petition from March 22, 2005 until November 7,

7  2007, so that he could exhaust his Confrontation Clause claim in state court.  On May 17,

8  2006, the California Supreme Court denied habeas relief.  This court reopened the case on

9  November 7, 2007, noting that on February 28, 2007, the United States Supreme Court

10  reversed the Ninth Circuit's decision that *Crawford* applied retroactively, thus mooting the

11  reason for the stay.  *See Whorton v. Bockting,* 549 U.S. 406, 421 (2007).

12      On December 24, 2008, Jennings filed a substitution of counsel and requested that

13  he be permitted to file, with his new counsel's assistance, a supplemental brief to "further

14  clarify the issues" in this case.  On January 7, 2009, the court granted Jennings' motion,

15  noting that six years had elapsed since the briefing in this case was completed.  After

16  several continuances, Jennings filed his supplemental brief on April 3, 2009, and the state

17  filed a supplemental opposition on May 27, 2009.

18  **II.   Factual Background**

19      The charges stem from the following facts.  On the night of January 28, 1991,

20  Madden, the manager of LeeWards, a large crafts store in Santa Clara County, was robbed

21  and stabbed to death after closing the store.  Early in the morning on January 29, 1991,

22  Madden's wife discovered that he had not returned home from work.  She called the police,

23  who checked outside the store, but found nothing unusual.  However, when the assistant

24  manager, Gayle Carlile, arrived at the store later that morning, she discovered Madden's

25  body in a back office.  The responding officers discovered that Madden's body was bound

26  with duct tape and covered with stab wounds.  Madden's wallet was open on his desk

27  nearby, and a card with Honeywell alarm contact information was protruding from the

28  wallet.

United States District Court

For the Northern District of California

1    Madden's wrists and ankles were bound with duct tape, and there was also duct

2  tape around his head, covering his mouth.  He had been stabbed twenty-four times,

3  including four stab wounds to each lung, and six to his heart.  Madden had also been

4  stabbed in the neck, penetrating his windpipe.  An autopsy revealed that the stab wounds

5  were the cause of his death, and that he would have died within seconds or minutes of

6  being stabbed in the heart.  Madden also had pinpoint abrasions on his thigh that were

7  consistent with being hit by a stun gun.  Officers recovered a knife from a bin at the back of

8  the store, which proved to be the murder weapon, and also recovered a can containing

9  camping fuel near a trailer in the parking lot behind the store.

10    The motive appeared to be robbery as approximately $9,200 was missing from the

11  safe in Madden's office.  When police questioned Carlile, the assistant manager, she

12  identified two of Jennings' codefendants, Danny Silveria and John Travis, as possible

13  suspects.  According to Carlile, Silveria and Travis were former employees, who had both

14  been fired in the fall of 1990 and were possibly disgruntled.  Employees, including Silveria

15  and Travis, were paid weekly from the safe in Madden's office, and both would have

16  observed the cash drawers and the safe while working at the store.

17    That same evening, January 29, 1991, police arrested Silveria, Travis, and Troy

18  Rackley, in the parking lot of a San Jose, California mall.  Silveria and Travis were in

19  separate cars.  In Silveria's car, the officers found $594 cash, a canvas bag, duct tape, a

20  pry bar, and a stun gun.  In Travis' car, officers discovered $1,544 cash and some batteries

21  with a LeeWards price tag.  Silveria cooperated with officers, and paged Jennings, asking

22  him to meet up with them.  When Jennings failed to show, Silveria drove the officers to an

23  apartment where he thought Jennings could be found.   Jennings was not there, but an

24  occupant of the apartment consented to a search, and the officers found a case under a

25  bed containing $722 cash.  Soon after, Jennings returned and was arrested outside the

26  apartment.  The officers seized Jennings' truck, which a receipt revealed had been

27  purchased that same day.

28    At his trial, which occurred after the trials and convictions of his codefendants,

4

Jennings attempted to show that he was not culpable for the murder to the same degree as Spencer, Silveria, and Travis.  His defense was that he was not aware that a murder had been planned, but instead was only aware of the planning of the robbery.  Additionally, it was his defense that he did not participate in the murder, but was outside of the store at the time.

The evidence against Jennings consisted of witness testimony regarding his relationship with the codefendants, and his activities and behavior prior to and after the crimes.  Additionally, two of Jennings' ex-girlfriends also testified to admissions that he made to them over the phone while in jail.  Other than his codefendants, there were no eyewitnesses to the crimes, and their statements to law enforcement officers that were read into the record were the only ones describing the crime itself.

Numerous witnesses testified who implicated Jennings and his three codefendants, Silveria, Travis, and Spencer.  Trial testimony revealed that the four were close friends who spent a fair amount of time together.  One of the witnesses, Robert Standard, lived in an apartment above Jennings' apartment, and saw Jennings with the other codefendants on a daily basis.  Standard described Jennings as the "leader of the pack."  Standard also testified that he overheard the group planning to rob LeeWards store and bragging about using a stun gun in robberies.  Standard testified, though, that he never heard Jennings and the codefendants planning a homicide - only a robbery.

At some point during the month of January 1991, Standard visited Jennings and the codefendants at a cabin in Uvas Canyon, located in a Santa Clara County Park.  The owner of the cabin also testified at trial that following a call by a neighbor, he went to his cabin on January 28, 1991, the day of the murder, and made a strange discovery.  He discovered graffiti on the walls, and mattresses and furniture that had been destroyed and utilized as firewood.  He also found camping equipment, clothing, a piece of duct tape, a LeeWards name tag with the name "Danny Silveria" on it, and newspaper clippings describing a stun gun robbery.

Several other neighbors of Jennings also testified at trial.  One of the witnesses,

United States District Court

For the Northern District of California

1   Cynthia Tipton, was also a neighbor to both Jennings and witness Standard.  Tipton

2   testified that a week or two before the robbery, Jennings showed her the stun gun and

3   even offered her an opportunity to touch it.  She also testified that the morning after the

4   robbery, codefendant Silveria, who sometimes lived with Tipton and her boyfriend, showed

5   up at her apartment and admitted his involvement in the robbery to her, after which she

6   called the police.  Tipton attested that the codefendants were always together, and that

7   Jennings was one of the leaders of the group.

8       Another neighbor, Alice Gutierrez, and her boyfriend, Charles Wagner, testified that

9   Jennings had always been unemployed and did not own a car, yet on the day after the

10  robbery, Jennings and a codefendant showed up at Jennings' apartment with new haircuts,

11  a new car, and displayed a suitcase containing thousands of dollars to Gutierrez.  Gutierrez

12  attested that Jennings asked her for maps, advising her that they were going to leave the

13  state.  Wagner asserted that he supplied Jennings with an atlas.  He also testified that

14  Jennings was unable to look him in the eye after Wagner asked Jennings what he had

15  done.  Jennings left the suitcase with the cash at Gutierrez's apartment, stating that he

16  would return for it.  Several days later, Jennings' brother, Jim, came looking for the

17  suitcase, but by that time, the police had already seized it.

18      Gutierrez's and Wagner's roommate, John Durbin, also recounted that Jennings and

19  another codefendant showed up on the evening after the murder with new clothes and new

20  vehicles, and flashing several hundred dollars.  Jennings sported a new haircut and

21  appeared edgy.  He also asked Durbin for an atlas, and advised him that he was leaving for

22  Reno.  Durbin further testified that he knew Jennings and several codefendants from junior

23  highschool and testified that he remembered one of the codefendants expressing his dislike

24  for the victim, Madden.

25      Numerous other witnesses testified, corroborating testimony that suggested

26  Jennings and his codefendants may have used a stun gun in the robbery and murder, and

27  that following the robbery, the defendants purchased new vehicles and clothing with the

28  cash from the robbery.  Jennings' former long-term girlfriend, Cari Carlino testified that

United States District Court

For the Northern District of California

1   Jennings confessed to the robbery when he called her from jail.  She testified that Jennings

2   told her that they had gone to LeeWards to rob the store, but had not intended to kill

3   Madden.  Jennings told Carlino that he was not inside the store at the time of the robbery,

4   but was waiting outside.  He informed Carlino that two other codefendants went into the

5   store and told the victim to turn off the store's alarm system and duct-taped the victim.

6   Jennings also told Carlino that the defendants obtained $9,000.00 in the robbery.  Another

7   ex-girlfriend and mother of Jennings' child testified that Jennings also called her from jail

8   and apologized to her, advising her that he waited outside during the robbery.

9       At trial, the evidence revealed that the victim's blood was discovered on several of

10  Jennings' codefendants' clothing, but not on the clothing Jennings was wearing at the time

11  of his arrest.  Additionally, the parties introduced numerous stipulations and statements

12  from Jennings' codefendants into evidence.  These included stipulations that Silveria had

13  been convicted of the burglary of a sporting goods store, and two robberies of a quick mart

14  and a bottle shop, all of which occurred days before the LeeWards robbery.  There was

15  also a stipulation that Jennings had pled guilty to all three of those crimes as well.

16  Additionally, the parties stipulated that a stun gun was stolen from the sporting goods store

17  robbery days before the robbery and murder at issue in this case.  It was also stipulated

18  that Jennings' codefendants Spencer, Travis, and Silveria had already been convicted of

19  Madden's murder.

20      The jury also heard statements from Jennings' codefendants, which were read into

21  the record.  Spencer stated that Silveria set up the robbery, and that because Silveria and

22  Travis had both worked for the victim at LeeWards, they knew before they entered the

23  store that it would be necessary to kill him because he would be able to identify them.

24  According to Spencer, Jennings entered the store but subsequently went outside to stand

25  guard and start the car.  During the robbery, the alarm company called the store, but the

26  defendants forced Madden to give the company the code to disable the alarm.  Spencer

27  admitted that he duct-taped Madden, and also admitted that he stabbed Madden three to

28  four times.  Silveria and Travis also stabbed Madden, but Jennings did not.  Madden

United States District Court

For the Northern District of California

attempted to escape, but Silveria shot him with the stun gun.

Silveria's statement provided more details of the crime.  He told the police that he and the codefendants planned the crime at the Uvas Canyon cabin.  He advised them that at the time the defendants arrived at the store on the evening of January 28, 1991, cleaning people were inside.  The defendants waited outside, aware that Madden had to let the cleaning people out after they were finished.  During that time, Spencer slashed Madden's tires to ensure that he would be unable to escape.  After approximately one and one-half hours, Madden let the cleaning people out, and the defendants "rushed" Madden and forced him inside.  The store alarm sounded, and Silveria ordered Madden to turn it off.  Meanwhile, according to Silveria, Jennings got "cold feet," and Silveria told him to go outside and start the car.

Silveria stated that the defendants then ordered Madden to open the safe and put the cash in a duffel bag.  They subsequently tied Madden to a chair using duct tape.  They untaped his mouth when the alarm company called, and ordered him to calmly provide the information for the company to turn off the alarm.  Using a card from his wallet, Madden complied and advised the alarm company that he would be at the store for another hour.  The defendants then re-taped Madden's mouth.

Spencer subsequently slit Madden's throat, and stabbed him in the chest area.  Spencer handed the knife off, and Travis and Silveria also stabbed Madden.  According to Silveria, Travis had been planning the murder for several weeks.

Contrary to Silveria, in his statement, Travis initially asserted that the defendants intended to rob the store, not to kill Madden.  However, Travis later admitted that he knew from the start that it would be necessary to kill Madden.  Otherwise, Travis corroborated the above statements made by Silveria.

**ISSUES**

Jennings raises the following four claims, one of which consists of several sub-claims, in his federal habeas petition:

(1) his due process rights were violated by the admission of evidence that he

**United States District Court**

For the Northern District of California

bragged about a prior robbery;

(2) (a) his due process rights were violated by an unconstitutionally overbroad application of the lying-in-wait special circumstance; (b) the lying-in-wait jury instruction was constitutionally deficient; and (c) there was insufficient evidence to support the lying-in-wait special circumstance; and

(3) there was insufficient evidence to support the felony murder special circumstances findings that he was a "major participant" and that he showed a "reckless indifference to human life;" and

(4) the admission of his codefendants' extrajudicial statements prejudicially violated his rights under the Confrontation Clause.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "on behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Because the petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), the provisions of that act apply here.  *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997).  Under the AEDPA, a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254 (d).

A state court decision is "contrary to" Supreme Court authority, falling within the first clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decided a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."

United States District Court

For the Northern District of California

1   *Williams v. Taylor*, 529 U.S. 362, 412-413 (2000).  "Clearly established federal law" under §

2   2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at

3   the time the state court renders its decision."  *Lockyer v. Andrade*, 538 U.S. 63, 71-72

4   (2003).  This "clearly established" law "refers to the holdings, as opposed to the dicta, of

5   [Supreme] Court decisions as of the time of the relevant state court decision."  *Id.*

6        "Under the 'unreasonable application' clause" of § 2254(d)(1), a federal habeas court

7   may grant the writ if the state court identifies the correct governing legal principle from [the

8   Supreme] Court's decisions but unreasonably applies that principle to the facts of the

9   prisoner's case."  *Id.* at 74.  However, this standard "requires the state court decision to be

10  more than incorrect or erroneous."  *Id.*  For the federal court to grant habeas relief, the

11  state court's application of the Supreme Court authority must be "objectively unreasonable."

12  *Id.* at 74-75.  The "objectively unreasonable" standard is different from the "clear error"

13  standard in that "the gloss of clear error fails to give proper deference to state courts by

14  conflating error (even clear error) with unreasonableness."  *Id.* at 75; *see also Clark v.

15  Murphy*, 331 F.3d 1062, 1068 (9th Cir. 2003).  Therefore, "[i]t is not enough that a habeas

16  court, in its independent review of the legal question, is left with a firm conviction that the

17  state court was erroneous . . . Rather, the habeas court must conclude that the state

18  court's application of federal law was objectively unreasonable."  *Andrade*, 538 U.S. at 75;

19  *see also Clark*, 331 F.3d at 1068.

20       As for state court findings of fact, under § 2254(d)(2), a federal court may not grant a

21  habeas petition by a state prisoner unless the adjudication of a claim on the merits by a

22  state court resulted in a decision that was based on an unreasonable determination of the

23  facts in light of the evidence presented in the state court proceeding.  28 U.S.C. §

24  2254(d)(2).  The "clearly erroneous" standard of unreasonableness that applies in

25  determining the "unreasonable application" of federal law under § 2254(d)(1) also applies in

26  determining the "unreasonable determination of facts in light of the evidence" under §

27  2254(d)(2).  *See Torres v . Prunty*, 223 F.3d 1103, 1107-1108 (9th Cir. 2000).  To grant

28  relief under 2254(d)(2), a federal court must be "left with a firm conviction that the

United States District Court

For the Northern District of California

1   determination made by the state court was wrong and that the one [petitioner] urges was

2   correct."  *Id.* at 1108.

3       However, when the state court decision does not articulate the rationale for its

4   determination or does not analyze the claim under *federal* constitutional law, a review of

5   that court's application of clearly established federal law is not possible.  *See Delgado v.*

6   *Lewis*, 223 F.3d 976, 981-82 (9th Cir. 2000); *see also* 2 J. Liebman & R. Hertz, Federal

7   Habeas Corpus Practice and Procedure § 32.2, at 1424-1426 & nn. 7-10 (4th ed. 2001).

8   When confronted with such a decision, a federal court must conduct an independent review

9   of the record and the relevant federal law to determine whether the state court's decision

10  was "contrary to, or involved an unreasonable application of, "clearly established federal

11  law."  *Delgado*, 223 F.3d at 982.

12          When a state court does not furnish a basis for its reasoning, we have no
            basis other than the record for knowing whether the state court correctly
13          identified the governing legal principle or was extending the principle into a
            new context. . . .[A]lthough we cannot undertake our review by analyzing the
14          basis for the state court's decision, we can view it through the 'objectively
            reasonable' lens ground by *Williams* [, 529 U.S. 362]. . . . Federal habeas
15          review is not de novo when the state court does not supply reasoning for its
            decision, but an independent review of the record is required to determine
16          whether the state court clearly erred in its application of controlling federal
            law. . . .  Only by that examination may we determine whether the state
17          court's decision was objectively reasonable.

18  *Id.*

19                          **DISCUSSION**

20  **I.    Jennings' Claim re: the Admission of "Bragging Evidence"**

21          As noted, one of the witnesses called by the prosecution at trial was Robert

22  Standard, who lived in an apartment above Jennings' apartment, and saw Jennings with

23  the other codefendants on a daily basis.  Standard testified generally that the four were

24  close friends who spent a fair amount of time together.

25          During Standard's direct examination, the prosecution asked him about a

26  conversation that Jennings, Travis, and Silveria had in his presence regarding an unrelated

27  robbery of a Quik Stop.  Reporters Transcripts ("R.T.") 5460.  Standard had apparently

28  discussed the incident with an investigator previously.  *Id.*

                                    11

United States District Court

For the Northern District of California

As soon as the prosecution began to question Standard regarding the incident, defense counsel objected to his testimony regarding the prior robbery as irrelevant.  R.T. 5460-61.  In a bench conference that followed, the prosecution argued that the testimony was relevant to demonstrate the relationship among the codefendants and the fact that they bragged about other crimes in the presence of Standard, their neighbor.  *Id.*  The trial court allowed the testimony for the limited purpose of demonstrating the relationship among the codefendants, and gave the jury a limiting instruction as follows:

> Ladies and gentlemen, I'm allowing the [testimony] for a very limited purpose and that purpose is not to show that in fact the five defendants or any one of them committed another robbery, other than LeeWards.  I'm not allowing it for that.
>
> I am allowing it to show what the relationship was if any between the five people that we have been talking about.  I am allowing it solely for that purpose.

R.T. 5462.

Standard testified that the codefendants were bragging about using a stun gun in the robbery, and admitted after having his recollection refreshed, that he previously told an investigator that Jennings did most of the bragging about "zapping" the guy and taking his money.  R.T. 5463.  One of the conversations Standard witnessed regarding the prior robbery took place in Uvas Canyon.  *Id.*  Jennings and his codefendants had newspaper clippings regarding the Quik Stop robbery and were bragging that they couldn't be caught.  *Id.*

Jennings argues that the admission of the testimony violated his due process rights because the evidence was irrelevant, had no probative value, and was highly prejudicial.  In his state appellate brief, Jennings argued that contrary to the prosecution's proffer otherwise, it relied on the evidence *not* to show the defendants' relationships, but instead "as an attempt to bolster the otherwise weak and unpersuasive evidence of reckless indifference to human life on [Jennings'] part in this case."

In its opposition brief filed with the California Court of Appeal, the state asserted that the prosecution had strong evidence that Jennings' other codefendants, Spencer, Travis, and Silveria, had discussed the need to kill Madden in this case.  In terms of the bragging

12

testimony's probative value, the state conceded that

> [t]he primary problem with proof for the prosecution was to show that appellant was aware of, and shared in the intent to kill Madden before the group traveled to [LeeWards] on the evening of the killings.  The primary method of showing [Jennings'] knowledge was to show that [Jennings] was a leader in the group, and that the group discussed all of their activities thoroughly with one another.  It seems plain that proof by an ear witness that appellant and the other four openly discussed previous criminal behavior was the strongest proof that [Jennings] would have been privy to conversations by the other accomplices about plans for the killing of Madden at the robbery of LeeWards store.  While a group of young men might openly discuss numerous topics, proof that they actually discussed their relative culpability in felonious criminal activity was indispensable for proof that the entire group would be privy to discussions about future felonious activity.  Plainly, the evidence was strongly probative.

Exh. B at 63-64.

The state also argued that there was minimal prejudice to Jennings, implying that the evidence was duplicative.  It noted that the parties had already stipulated that Jennings participated in prior robberies, including one in which a stun gun was used.  It also argued that other witness testimony established Jennings' familiarity with the stun gun, and Jennings' close relationship with the group of codefendants.

The California Court of Appeal affirmed the trial court's admission of the evidence, holding that it was probative because it showed a commonality of purpose among Jennings and the codefendants; it helped establish a greater likelihood that Jennings shared his codefendants' intent to kill Madden; and it tended to establish Jennings' dominant role in the group.  It also held that the evidence demonstrated Jennings' and his codefendants' familiarity with a stun gun.  The court concluded that the probative value was not outweighed by its prejudicial effect.

In his briefs before this court, including his supplemental traverse filed by counsel, Jennings cites only state law in arguing that his due process rights were violated by the admission of Standard's testimony.  He contends that the real purpose behind the evidence was to taint the jury by references to the stun gun, and argues that plenty of other evidence regarding the codefendants' relationship was available.

The state argues that Jennings did not exhaust the claim under federal law, and also that he has waived it by failing to cite federal law before this court.  Nevertheless, it

United States District Court

For the Northern District of California

1    contends that the state appellate court's ruling was reasonable and comports with federal

2    law.  It asserts that the evidence tended to show that Jennings, "far from being the passive

3    observer he claims, was an active, bragging, stun-gun-using participant in the group's

4    escapades."

5           Although the court agrees that Jennings' briefs before this court are not models of

6    clarity and would have been more helpful had he cited federal law and made more effort to

7    frame the claim as a federal issue, the court nevertheless concludes that Jennings indeed

8    exhausted the federal nature of this claim before the state court.  State courts must be

9    alerted to the fact that prisoners are asserting claims under the United States Constitution

10   in order to be given the opportunity to correct alleged violations of federal rights.  *Duncan v.*

11   *Henry*, 513 U.S. 364, 365-66 (1995).  Here, Jennings sufficiently alerted the California

12   Supreme Court to the federal nature of the claim in his petition for review, asserting that he

13   "was deprived of his state *and federal* constitutional rights to due process by the erroneous

14   admission" of the evidence.  *See* Exh. H at 11.

15          The admission of evidence is not subject to federal habeas review unless a specific

16   constitutional guarantee is violated or the error is of such magnitude that the result is a

17   denial of the fundamentally fair trial guaranteed by due process.  *See Henry v. Kernan*, 197

18   F.3d 1021, 1031 (9th Cir. 1999).  Failure to comply with state rules of evidence is neither a

19   necessary nor a sufficient basis for granting federal habeas relief on due process grounds.

20   *See Henry*, 197 F.3d at 1031; *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991).

21   While adherence to state evidentiary rules suggests that the trial was conducted in a

22   procedurally fair manner, it is certainly possible to have a fair trial even when state

23   standards are violated; conversely, state procedural and evidentiary rules may

24   countenance processes that do not comport with fundamental fairness.  *See id.*  The due

25   process inquiry in federal habeas review is whether the admission of evidence was

26   arbitrary or so prejudicial that it rendered the trial fundamentally unfair.  *See Walters v.*

27   *Maass*, 45 F.3d 1355, 1357 (9th Cir. 1995); *Colley v. Sumner*, 784 F.2d 984, 990 (9th Cir.

28   1986).  The admission of evidence may violate a petitioner's due process rights only if there

are *no* permissible inferences that the jury may draw from the evidence. *See Jammal*, 926 F.2d at 920. Juries are presumed to follow a court's limiting instructions with respect to the purposes for which evidence is admitted. *Aguilar v. Alexander*, 125 F.3d 815, 820 (9th Cir. 1997).

The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ." *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of, clearly established federal law under § 2254(d)). It has declined to hold that evidence of other crimes or bad acts "so infused the trial with unfairness as to deny due process of law." *Estelle v. McGuire*, 502 U.S. 62, 75 n. 5 (1991) (noting that the Court "express[ed] no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"). Similarly, the Court has left open the question of whether admission of propensity evidence violates due process. *Id.* Based on the Supreme Court's reservation of this issue as an "open question," the Ninth Circuit has held that a petitioner's due process right concerning the admission of propensity evidence is not clearly established as required by AEDPA. *Alberni v. McDaniel*, 458 F.3d 860, 866-67 (9th Cir. 2006); *accord Mejia v. Garcia*, 534 F.3d 1036, 1046 (9th Cir. 2008) (reaffirming *Alberni*); *see also, e.g., Larson v. Palmateer,* 515 F.3d 1057, 1066 (9th Cir. 2008) (because Supreme Court expressly reserved the question of whether using evidence of prior crimes to show propensity for criminal activity could ever violate due process, state court's rejection of claim did not unreasonably apply clearly established federal law). It has also held that the admission of similar prior bad acts to show motive and intent, coupled with limiting instructions, was appropriate. *Houston v. Roe*, 177 F.3d 901, 910 n.6 (9th Cir. 1999); *see Terrovona v. Kincheloe*, 912 F.2d 1176, 1180-81 (9th Cir. 1990) (admission of prior bad act testimony did not violate due process where trial court balanced probative weight against prejudicial effect and gave jury

United States District Court

For the Northern District of California

1  cautionary instruction).

2      Additionally, in order to obtain habeas relief on the basis of an evidentiary error, a

3  petitioner must show that the error was one of constitutional dimension *and* that it was not

4  harmless under *Brecht v. Abrahamson,* 507 U.S. 619 (1993).  In other words, a petitioner is

5  required to show that the error had "a substantial and injurious effect on the verdict."

6  *Dillard v. Roe*, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting *Brecht*, 507 U.S. at 623).

7      Here, the essence of Jennings' claim is that admission of evidence concerning the

8  prior robbery and his bragging regarding that robbery was irrelevant and/or inherently

9  prejudicial so as to render his trial fundamentally unfair in violation of due process.

10  However, as set forth in *Holley*, Jennings' claim is foreclosed in light of the fact that there is

11  no clearly established federal law "ruling that admission of irrelevant or overtly prejudicial

12  evidence constitutes a due process violation sufficient to warrant issuance of the writ."  568

13  F.3d at 1101.  Thus, this court cannot conclude that the state court's ruling on this issue was

14  either contrary to, or an unreasonable application of clearly established federal law.  Nor

15  has there been any argument or showing that the state court's decision was based on an

16  unreasonable determination of the facts in light of the evidence presented.

17  **II.    Jennings' Claims re: Special Circumstances**

18      Prior to discussing the special circumstances issues raised by Jennings, the court

19  sets forth the relevant state law regarding special circumstances.

20      **A.    California Law re: Special Circumstances**

21      A basic provision of California's death penalty law provides that if a defendant is

22  found guilty of first degree murder - including first degree felony murder -- and one or more

23  of certain listed special circumstances are charged and found to be true, the penalty shall

24  be death or life imprisonment without parole.  Cal. Penal Code § 190.2(a).  Here, as noted,

25  the jury found Jennings guilty of three special circumstances, including burglary and

26  robbery under California Penal Code § 190.2(a)(17), and lying in wait under California

27  Penal Code § 190.2(a)(15).

28      Before addressing the specific requirements of the felony murder and lying-in-wait

**United States District Court**

For the Northern District of California

special circumstances, some discussion of the history of section 190.2 and its general

provisions is warranted.  Subsections (c) and (d) of California Penal Code § 190.2 in effect

at the time of the murder in this case, January 29, 1991, provided:

> (c) Every person **not the actual killer** who, **with the intent to kill**, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in subdivision (a) of this section has been found to be true under Section 190.4.
>
> (d) Notwithstanding subdivision (c), every person **not the actual killer**, who, **with reckless indifference to human life and as a major participant**, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a), which felony results in the death of some person or persons, who is found guilty of murder in the first degree therefor, shall suffer death or confinement in state prison for life without the possibility of parole, in any case in which a special circumstance enumerated in paragraph (17) of subdivision (a) of this section has been found to be true under Section 190.4.

(Emphasis added.)[6]

Section 190.2 had, however, been amended in significant ways only seven months

prior to the murder in this case.  Prior to June 6, 1990, section 190.2(b), subsection (c)'s

predecessor, provided in pertinent part:

> (b) Every person **whether or not the actual killer found guilty of intentionally aiding, abetting**, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case in which one or more of the special circumstances enumerated in (1), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12), (13), (14), **(15),** (16), **(17)**, (18), or (19) of subdivision (a) of this section has been charged and specially found under Section 190.4 to be true.

(Emphasis added) (amended by Stats.1989, c. 1165, § 16, (Prop. 114) approved June 5,

1990; Initiative Measure (Prop. 115), approved June 5, 1990).  Thus, prior to June 6, 1990,

an affirmative finding of one of the listed special circumstances required only that a non-

killer defendant "intentionally aid[] and abet[]," as opposed to the operative version of §

190.2(c) which required that non-killers possess an intent to kill.

---

[6]The current version of California Penal Code sections 190.2(c) and (d) is very similar to that in effect on January 29, 1991.  The differences in the two versions are not substantive. For example, the current version substitutes the word "confinement" for "imprisonment," and contains other similar non-substantive language changes.

United States District Court

For the Northern District of California

On June 5, 1990, approximately seven and one-half months prior to the murder in this case, as part of Proposition 115, California voters amended subsection (b) and replaced it with the operative subsection (c), and also added subsection (d).  That version of section 190.2 went into effect the next day on June 6, 1990, and was the same version in effect on January 29, 1991, the date of the murder in this case.

Section (c) codified the California Supreme Court's 1987 decision in *People v. Anderson*, 43 Cal. 3d 1104 (Cal. 1987).  *See* 3 Witkin & Epstein, Cal. Crim. Law 3d, Punishment § 460 (2000 ed. and 2009 Suppl.).  In *Anderson*, the California Supreme Court reconsidered its prior decision in *Carlos v. Superior Court*, 35 Cal. 3d 131, 150 (1983), in which it had previously held that the felony murder special circumstances required intent to kill on the part of killers and non-killers alike.  43 Cal. 3d at 1143-45.  The *Anderson* court held that its decision in *Carlos* was wrong, and that intent to kill was not required on the part of a *felony-murderer* who *actually* kills.  *Id.*  The *Anderson* court nevertheless implied that with respect to felony murder special circumstances, intent to kill was still required on the part of an aider and/or abettor who did not actually kill.  43 Cal. 3d at 1145-47.  In bringing § 190.2(c) into compliance with *Anderson*, the version of subsection (c) enacted by Proposition 115 required intent to kill on the part of non-killers whose special circumstances were governed by that section.

However, Proposition 115 not only brought section 190.2 into compliance with the California Supreme Court's decision in *Anderson,* but also added subsection (d), by which California voters adopted the United States Supreme Court's April 1987 decision in *Tison v. Arizona*, 481 U.S. 137 (1987), as it applied to felony murder special circumstances. *People v. Estrada*, 11 Cal. 4th 568, 575 (Cal. 1995) (subsection (d) was added to § 190.2 in order to bring California law into conformity with the *Tison* decision).  The statutory language of section 190.2(d) derives verbatim from the United States Supreme Court's decision in *Tison. Estrada*, 11 Cal. 4th at 575.

In *Tison,* the Court held that intent to kill is *not* a constitutional requirement for imposition of the death penalty under a felony murder theory.  *Tison* involved two brothers

18

United States District Court

For the Northern District of California

1  sentenced to death for committing first degree murder in connection with armed robbery,

2  kidnaping, and theft of a motor vehicle.  41 U.S. at 137.  The Court recognized that some

3  non-intentional murders may be among "the most dangerous and inhumane of all," and

4  held that persons who engage in criminal activity which shows a reckless indifference to the

5  value of human life were deemed to be every bit as culpable in a "moral sense" as those

6  who kill with an intent to kill.  *Id.* at 157.  Thus, the actual killer in such a case would be

7  eligible for death penalty consideration without regard to a finding of actual intent to kill.  *Id.*

8      The *Tison* Court also recognized that an aider and abettor to felony murder might

9  under certain circumstances be eligible for the death penalty without a finding of intent to

10  kill.  *Id.* at 158.  The Court held that the death penalty may be constitutionally imposed

11  under the Eighth and Fourteenth Amendments on an accomplice to a felony murder where

12  there was "major participation in the felony committed, combined with reckless indifference

13  to human life."  *Id.*  It held that "major participation" in the felony committed, combined with

14  "reckless indifference to human life," is sufficient to satisfy the culpability requirements for

15  the death penalty.  *Id.*  The *Tison* Court pointed out that the defendants in that case had

16  been actively involved in every element of the kidnap and robbery, and were physically

17  present during the entire sequence of criminal activity culminating in the murder which was

18  actually perpetrated by one person.  *Id.*  It concluded that those facts established major

19  participation in the underlying felony with a showing of reckless indifference to human life.

20  *Id.*

21      Following the enactment of California Penal Code § 190.2(d), the California

22  Supreme Court held that because "*Tison* is the source of the language of section 190.2(d) .

23  . . the constitutional standards set forth in [*Tison*] are therefore applicable to all allegations

24  of a felony-murder special circumstance [under California law], *regardless of whether the*

25  *People seek and exact the death penalty or a sentence of life without parole.*"  *Estrada*, 11

26  Cal. 4th at 575-76 (emphasis added).

27      In sum, currently and under the version of California Penal Code § 190.2(d) in effect

28  at the time of murder, intent to kill is and was not required for an aider and abettor with

19

respect to felony murder special circumstances where the aider and abettor acted with reckless indifference to human life and as a major participant with respect to the commission of the felony.  There is no dispute, though, that § 190.2(d), does *not* apply to the lying-in-wait special circumstance.

### 1.    *Felony Murder Special Circumstances*

California Penal Code § 190.2(a)(17), which governs the burglary and robbery special circumstances, provides:

> (a) The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true:
> . . . .
>
> (17) The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies:
>
>> (A) *Robbery* in violation of Section 211 or 212.5.
>>
>> . . . .
>>
>> (G) *Burglary* in the first or second degree in violation of Section 460.
>>
>> . . . .

(Emphasis added.)

Subsections (c) and (d), discussed above, both apply to felony murder special circumstances.  Therefore, in order to find that the special circumstance requirements of § 190.2(a)(17) have been met, a defendant (Jennings) must have either (1) been the actual killer of the victim (subsection (b)), (2) possessed an intent to kill the victim, even if he was not the actual killer (subsection (c)), or (3) acted with "reckless indifference to human life" and as a "major participant" in one of the specified felonies, even if the defendant was not the actual killer and did not possess any intent to kill (subsection (d)).

### 2.    *Lying-in-Wait Special Circumstance*

Unlike the felony murder special circumstances, unless Jennings was the actual killer, the lying-in-wait special circumstance required an intent to kill on Jennings' part.  That

United States District Court
For the Northern District of California

1   is because subsection (d), which allows for a felony murder special circumstances finding if

2   the defendant possesses reckless disregard and is a major participant, does *not* apply to

3   the lying-in-wait special circumstance.  Instead, only subsection (c) governs the intent

4   requirement.

5        The version of section 190.2(a)(15), the lying-in-wait special circumstance, in effect

6   at the time of Jennings' conviction provided in pertinent part:

> (a) The penalty for a defendant who is found guilty of murder in the first degree is
> death or imprisonment in the state prison for life without the possibility of parole if
> one or more of the following special circumstances has been found under Section
> 190.4 to be true:
> . . . .
>
> (15) The defendant intentionally killed the victim *while* lying in wait.[7]

## B.        California Court of Appeal's Decision re: Special Circumstances

12        Jennings challenged all three special circumstances findings on appeal.  He

13   contended that there was insufficient evidence to support the felony murder special

14   circumstances allegations that he was a "major participant" and that he acted with "reckless

15   indifference to human life."  Cal. Penal Code § 190.2(d).  As for the lying-in-wait special

16   circumstance, Jennings argued that the special circumstance was overbroad and

17   unconstitutional, that there was insufficient evidence supporting the elements required for

18   the special circumstance, and that the lying-in-wait jury instruction was erroneous because

19   it was phrased solely in terms of the proof necessary for conviction of the actual killer.

20        On appeal, the California Court of Appeal held that, based on the verdict form with

---

[7]Approximately nine years after the murder in this case occurred, the statute was amended in 2000 to provide:

(15) The defendant intentionally killed the victim *by means of* lying in wait.

Proposition 18, an initiative approved by the voters in the March 7, 2000, Primary Election, and effective March 8, 2000, changed the language of the lying-in-wait special circumstance to delete the word "while" and substitute in its place "by means of." Stats.1998, ch. 629, § 2; *People v. Michaels*, 28 Cal. 4th 486, 516 (Cal. 2002).   The California Supreme Court subsequently recognized that the requirements of the lying-in-wait special circumstance pre-amendment and at the time Jennings was convicted were more stringent than the current requirements for the lying-in-wait special circumstance.  *People v. Lewis*, 43 Cal. 4th 415 (Cal. 2008).

United States District Court

For the Northern District of California

1   respect to the lying-in-wait special circumstance, the jury found that Jennings possessed an

2   intent to kill Madden.[8]   The court held that based on this finding, whether Jennings was a

3   "major participant" and acted with "reckless indifference" was "of no consequence" with

4   respect to the felony murder special circumstances, noting that "[r]eading section 190.2 (c)

5   and (d) together, it is plain that the question of whether an aider and abettor acted with

6   'reckless indifference to human life and as a major participant' is critical only where such

7   aider and abettor had no intent to kill and the killing is attended with any of the special

8   felony murder circumstances listed under section 190.2(17), such as robbery and burglary."

9       The California Court of Appeal then appears to have mistakenly concluded that

10   Jennings did not challenge the sufficiency of the evidence establishing his intent to kill.

11   This court, however, finds that to be an unreasonable construction of the arguments.

12   Jennings clearly challenged any conclusion that he personally intended to kill Madden by

13   virtue of challenging the lesser requirements of "reckless indifference" and his role as a

14   "major participant."  If Jennings had conceded that he possessed an intent to kill, that

15   would have rendered his "reckless indifference" and "major participant" arguments entirely

16   moot and without any merit.

17       Turning to the lying-in-wait special circumstance, the state court held that there was

18   sufficient evidence of a surprise attack on Madden, and also that there was sufficient

19   evidence of Jennings' intent to kill.[9]   The state court first found that there was no evidence

20   of any lapse in Jennings' culpable mental state from the period of his lying in wait to

21   Madden's murder.  It held that "Jennings' act of leaving the store, was not for the purpose

22   of terminating his participation in the crimes but for the purpose of standing watch outside

23   to ensure [the defendants'] safety and preparing the car to enhance their escape, facilitated

24

25       [8]The verdict form stated that the jury found true "the first special circumstance allegation

26   that the defendant Matthew George Jennings, intentionally killed James Madden while lying
    in wait."  Clerks Transcripts ("C.T.") 2044, Vol. 8.

27       [9]The conclusion that there was sufficient evidence of intent to kill with respect to the
    lying-in-wait special circumstance is inconsistent with the state court's prior assessment

28   regarding the felony murder special circumstances that Jennings was *not* challenging the
    sufficiency of the evidence re: his intent to kill.

United States District Court

For the Northern District of California

1   the commission of the crimes."

2       The California Court of Appeal then held that in order for the lying-in-wait special

3   circumstance to be true, there did *not* need to be evidence that *Jenning's* own mental state

4   was equivalent to premeditation and deliberation independent of that of the actual killers.

5   Citing *People v. Beeman*, 35 Cal. 3d 547, 560 (Cal. 1984), the state appellate court held

6   that "[t]he rule is settled that an aider and abettor shares the mental state of the perpetrator

7   when the aider or abettor knows the full extent of the perpetrator's criminal purpose and

8   gives aid or encouragement with the intent or purpose of facilitating the perpetrator's

9   commission of the crime."  Accordingly, the court held that "it was not error that the trial

10  court's instruction [CALJIC No. 8.80.1] contained no language requiring that an aider and

11  abettor must be shown to have had any particular role in the lying in wait or to himself

12  possess a state of mind equivalent to premeditation and deliberation."[10]

13      Nevertheless, the state appellate court continued on to suggest that there was

14  sufficient record evidence of an intent to kill on Jennings' part in support of the lying-in-

15  wait special circumstance, noting the following: (1) that Jennings was always with Silveria,

16  Travis, and Spencer, including on occasions when the robbery and killings were discussed;

17  (2) Jennings was with the codefendants when they lay in wait for approximately an hour on

18  the night of the killing when the cleaners were in the store; (3) Jennings was with the

19  codefendants when they entered the store; and (4) Jennings knew that his codefendants'

20  purpose was to rob the store and kill Madden.

21      **C.    Lying-in-Wait Special Circumstance Claims**

22          **1.    The Lying-in-Wait Special Circumstance was not
                Unconstitutionally Broad**

23  Jennings argues that the lying-in-wait special circumstance is unconstitutionally

24

25  _____

26      [10]The court notes that this particular conclusion, that it wasn't necessary that Jennings
    possess an intent to kill with respect to the lying-in-wait special circumstance as long as the

27  actual killers that he aided possessed an intent to kill, is inconsistent with the state appellate
    court's earlier reliance on the jury's lying-in-wait finding to itself find that Jennings possessed

28  intent to kill with respect to the felony murder special circumstances.

United States District Court

For the Northern District of California

1    broad because it could encompass virtually any felony murder.  The California Court of

2    Appeal did not expressly address the issue other than to state that it was "without merit."

3         The distinction between the underlying murder conviction and the special

4    circumstances findings is important because the United States Supreme Court has held

5    that to satisfy the Eighth Amendment, an aggravating factor - like the lying-in-wait special

6    circumstance - that renders a defendant subject to the death penalty must reasonably

7    distinguish his conduct from that of the general run of murderers not to be sentenced to

8    death.  *See Tuilaepa v. California*, 512 U.S. 967, 971-72 (1994).

9         The Ninth Circuit recently recognized that the "identity of language between the first

10   degree murder statute[11] and the special circumstance naturally raises the question whether

11   the special circumstance adequately distinguishes a subset of violators subject to a more

12   severe penalty."  *See Bradway v. Cate*, 588 F.3d 990, 991 (9th Cir. 2009).  It has also

13   noted that where a petitioner like Jennings is not sentenced to death, he lacks standing to

14   raise an Eighth Amendment challenge, but instead may present what it has referred to as a

15   "specialized vagueness challenge" to California's lying-in-wait special circumstance under

16   the Due Process Clause, which appears to be what Jennings has done.  *Id.* at 991-92

17   (citing *Houston v. Roe*, 177 F.3d 901, 907-08 (9th Cir. 1999)).

18        In *Houston*, the Ninth Circuit expressly rejected a due process challenge to

19   California's special circumstances statute as it existed at the time of Jennings' conviction.

20   The *Houston* court held that:

21        the California legislature and courts ha[d] created a thin but meaningfully
          distinguishable line between first degree murder lying in wait and special
22        circumstances lying in wait. That "thin" difference was that the language of the
          special circumstances statute at that time referred to murders committed
23        "while" lying in wait, imposing a temporal requirement, and the first degree
          murder statute referred to murders committed "by means of" lying in wait,
24        lacking such a requirement.

25

26        _____

27        [11]California Penal Code § 189 defines first degree murder as, among other things,
     "murder which is perpetrated *by means of* . . . lying in wait."  Such first degree murder is
     punishable by death or life without parole if any special circumstance is found to be true.  One
28   such circumstance at the time of Jennings' conviction was that "[t]he defendant intentionally
     killed the victim *while* lying in wait."  Cal. Penal Code § 190.2(a)(15).

United States District Court

For the Northern District of California

1 *Bradway*, 588 F.3d at 990 (citing *Houston*, 177 F.3d at 908).  The *Houston* court held that

2 this distinction was sufficient to define and differentiate the subset of defendants guilty of

3 the special circumstance from the general run of defendants so that the special

4 circumstance "does not encourage arbitrary enforcement, and is not unconstitutionally

5 vague." *Id.; Bradford*, 588 F.3d at 990 (citing *Morales v. Woodford*, 388 F.3d 1159,

6 1174-78 (9th Cir. 2004) (upholding same special circumstance in death penalty case)).

7      In accordance with *Houston*, the court agrees that Jennings' claim is without merit,

8 and the state court's decision on the issue was therefore reasonable.

9         **2.**     **The Trial Court's Lying-in-Wait Jury Instruction Violated**

10                     **Jennings' Due Process Rights Because It Omitted an Element of**
                    **the Special Circumstance**

11      Jennings also challenges the lying-in-wait jury instruction, arguing that it was

12 phrased solely in terms of the proof necessary to convict the actual killer and not him, a

13 non-killer aider and abettor.

14      The trial court gave the following jury instructions relevant to the lying-in-wait special

15 circumstance.  It first provided the jury with the definition of "aiding and abetting" pursuant

16 to CALJIC 3.01 as follows:

17     A person aids and abets the commission of a crime when he or she:

18     (1) With knowledge of the unlawful purpose of the perpetrator, and

19     (2) With the intent or purpose of committing, encouraging, or facilitating the
commission of the crime, by act or advice  aids, promotes, encourages or
20     instigates the commission of the crime.

21     A person who aids and abets the commission of a crime need not be present
at the scene of the crime.
22

23     Mere presence at the scene of a crime which does not itself assist the
commission of the crime does not amount to aiding and abetting

24     Mere knowledge that a crime is being committed and the failure to prevent it
does not amount to aiding and abetting.
25

26 Clerks Transcripts ("C.T.") 1900; R.T. 6328-29.

27      The trial court subsequently gave the form jury instruction regarding aiding and

28 abetting a felony murder as follows:

1
2
3
4
5

> If a human being is killed by any one of several persons engaged in the commission of the crime of burglary and/or robbery, all persons, who either directly and actively commit the act constituting that crime [robbery or burglary], or who with knowledge of the unlawful purpose of the perpetrator of the crime and with the intent or purpose of committing, encouraging, or facilitating the commission of the offense [robbery or burglary], aid, promote, encourage, or instigate by act or advice its commission, are guilty of murder of the first degree, whether the killing is intentional, unintentional, or accidental.

6   C.T. 1925 (CALJIC 8.27, First Degree Felony-Murder - Aider and Abettor).

7   The trial court then instructed the jury as follows with respect to the special

8   circumstances.  It gave the jury a modified version of CALJIC 8.80.1, entitled "Special

9   Circumstances - Introductory."  It instructed the jury that:

10
11
12

> If you find [the] [a] defendant in this case guilty of murder of the first degree, you must then determine if [one or more of] the following special circumstance[s]:[are] true or not true: Murder while lying in wait, murder during commission of robbery, and murder during commission of burglary.

13
14

> The People have the burden of proving the truth of a special circumstance. If you have a reasonable doubt as to whether a special circumstance is true, you must find it to be not true.

15
16
17
18

> *You cannot find the special circumstance to be true unless you are satisfied beyond a reasonable doubt that the defendant with the intent to kill [aided,] [abetted,] [counseled,] [commanded,] [induced,] [solicited,] [requested,] [or] [assisted] any actor in the commission of the murder in the first degree] [.] [, or with reckless indifference to human life and as a major participant, [aided,] [abetted,] [or] [assisted] in the commission of the crimes of robbery or burglarly which resulted in the death of a human being, namely, James Madden.*

19
20

> A defendant acts with reckless indifference to human life when such defendant knew or was aware that [his] acts could result in the death of an innocent human being.

21
22
23
24

> You must decide separately each special circumstance alleged in this case. If you cannot agree as to all of the special circumstances, but can agree as to one, you must make your finding as to the one upon which you do agree. In order to find a special circumstance alleged in this case to be true or untrue, you must agree unanimously.  You will state your special finding as to whether this special circumstance is or is not true on the form that will be supplied.

25   C.T. 1934-35; R.T. 6344 (emphasis added).

26   The instruction given above was modified to omit two portions of the form CALJIC

27   8.80.1, those portions highlighted and boldened below:

28

> If you find [the] [a] defendant in this case guilty of murder of the first degree, you must then determine if [one or more of] the following special

26

United States District Court

For the Northern District of California

1    circumstance[s]: [is] [are] true or not true: [ ,] [ ,] [ ,] [ ] [and] [ ].

2    The People have the burden of proving the truth of a special circumstance. If
     you have a reasonable doubt as to whether a special circumstance is true,
3    you must find it to be not true.

4    **[Unless an intent to kill is an element of a special circumstance. [If] you
     are satisfied beyond a reasonable doubt that the defendant actually
5    killed a human being, you need not find that the defendant intended to
     kill in order to find the special circumstance to be true.]**

6
     **[If you find that a defendant was not the actual killer of a human being,
7    [or if you are unable to decide whether the defendant was the actual
     killer or [an aider and abettor] [or] [co-conspirator],]** you cannot find the
8    special circumstance to be true [as to that defendant] unless you are satisfied
     beyond a reasonable doubt that such defendant with the intent to kill
9    [aided,] [abetted,] [counseled,] [commanded,] [induced,] [solicited,]
     [requested,] [or] [assisted] [any actor in the commission of the murder in the
10   first degree] [.] [,] or with reckless indifference to human life and as a major
     participant, [aided,] [abetted,] [counseled,] [commanded,] [induced,]
11   [solicited,] [requested,] [or] [assisted] in the commission of the crime of which
     resulted in the death of a human being, namely .]
12
     [A defendant acts with reckless indifference to human life when that
13   defendant knows or is aware that [his] [her] acts involve a grave risk of death
     to an innocent human being.]
14
     [You must decide separately as to each of the defendants the existence or
15   nonexistence of each special circumstance alleged in this case. If you cannot
     agree as to all the defendants, but can agree as to one or more of them, you
16   make your finding as to the one or more upon which you do agree.]
     [You must decide separately each special circumstance alleged in this case
17   [as to each of the defendants]. If you cannot agree as to all of the special
     circumstances, but can agree as to one [or more of them], you must make
18   your finding as to the one [or more] upon which you do agree.]
     In order to find a special circumstance alleged in this case to be true or
19   untrue, you must agree unanimously.

20   You will state your special finding as to whether this special circumstance is
     or is not true on the form that will be supplied.
21
     The record demonstrates that the trial court indeed struck out the highlighted
22
     language in CALJIC 8.80.1 above, which distinguishes between the intent required of
23
     actual killers versus that of non-killers. C.T. 1934. The use note to CALJIC 8.80.1 provides
24
     that:
25
     This instruction applies to crimes committed on or after June 6, 1990.
26   An intent to kill is not an element of the special circumstances set forth in
     Penal Code § 190.2(a)(2), (3), (4), (5), (6) and (17). If an intent to kill is an
27   element of the special circumstance, delete paragraphs three and four. If
     there is no special circumstance requiring an intent to kill, delete the first
28   bracketed clause of paragraph three. *If there are both types of special*

*circumstance alleged, use paragraphs three and four, including the initial bracketed clause of paragraph three.* Aiding and abetting" is defined in CALJIC 3.01. The court has no sua sponte duty to define reckless indifference to human life if that is a prosecution theory being presented to the jury. However, upon request, the court must give a definition. Bracketed paragraph number five has been provided for that purpose. (*People v. Estrada*, 11 Cal. 4th 568 (Cal. 1995).)

(Emphasis added.)

It is not evident from the record why the trial court struck the above language from the instruction given that the use note specifically suggested its inclusion. In fact, the trial court's rulings on the jury instructions are not available in the record provided to this court. It appears that the jury instruction discussions took place in chambers and outside the presence of a court reporter, or they were simply not transcribed for the record on appeal.

The trial court also instructed the jury pursuant to CALJIC 8.83.1, "Special Circumstances – Sufficiency of Circumstantial Evidence to Prove Required Mental State," as follows:

The [specific intent] and [mental state] with which an act is done may be shown by the circumstances surrounding its commission. But you may not find a special circumstance alleged in this case to be true unless the proved surrounding circumstances are not only,

(1) consistent with the theory that the defendant had the required [specific intent] and [mental state], but

(2) cannot be reconciled with any other rational conclusion.

Also, if the evidence as to [any] [specific intent] and [mental state] is susceptible of two reasonable interpretations, one of which points to the existence of the [specific intent and [mental state] and the other to the absence of the [specific intent] and [mental state], you must adopt that interpretation which points to the absence of the [specific intent] and [mental state].

If, on the other hand, one interpretation of the evidence as to the [specific intent] and [mental state] appears to you to be reasonable and the other interpretation to be unreasonable, you must accept the reasonable interpretation and reject the unreasonable.

C.T. 1940.

Because the parties failed to adequately develop the arguments in their briefs before this court, including those briefs prepared by Jennings' counsel, the court was required to review the state court appellate briefs to fully comprehend their arguments on this issue.

28

United States District Court
For the Northern District of California

1    As noted, before the California Court of Appeal, Jennings contended that the jury

2  was improperly instructed on the lying-in-wait special circumstance because it was

3  instructed only in terms of the proof necessary with respect to an actual killer and not an

4  aider or abettor, apparently referencing the omissions to CALJIC 8.80.1.  He therefore

5  asserted that the jury could have improperly found the lying-in-wait special circumstance

6  true as to him based on proof of his codefendants' states of mind, as opposed to his own.

7  Jennings also argued that the jury likely mistakenly found true the lying-in-wait special

8  circumstance based on the reckless disregard requirement associated with the felony

9  murder special circumstances - as opposed to the intent to kill requirement associated with

10  lying in wait.

11    In its opposition before the state appellate court, the state's position on Jennings'

12  requisite mental state was somewhat inconsistent.  The state initially conceded that the

13  lying-in-wait special circumstance "does require an intent to kill on the part of an aider and

14  abettor."  Exh. B at 57.  Its initial position was *not* that the lying-in-wait instruction did not

15  require intent to kill on Jennings' part, but instead that "it [was] undisputed on the record

16  that [Jennings] lay-in-wait, and that he intended to kill."  However, the state then continued

17  on to argue that Jennings' liability "piggyback[ed] on the mental state of the actual killers,"

18  and that it was not necessary that Jennings possess an intent to kill.  Exh. B. at 57.  Citing

19  to *People v. Padilla*, 11 Cal. 4th 891 (Cal. 1995), and *People v. Beardslee*, 53 Cal.3d 68, 90

20  (Cal. 1990)*,* the state argued that proof that Jennings intentionally *aided and abetted* the

21  actual killers was sufficient to prove the lying-in-wait special circumstance.

22    As noted, the California Court of Appeal held that "it was not error that the trial

23  court's instruction [CALJIC No. 8.80.1] contained no language requiring that an aider and

24  abettor must be shown to have had any particular role in the lying-in-wait or to himself

25  possess a state of mind equivalent to premeditation and deliberation."  It reasoned that

26  Jennings did not need to personally possess an intent to kill.  Instead, citing *Beeman*, 35

27  Cal. 3d at 560, and *Beardslee*, 53 Cal. 3d at 90, the state appellate court held that "[t]he

28  rule is settled that an aider and abettor shares the mental state of the perpetrator when the

**United States District Court**
For the Northern District of California

aider or abettor knows the full extent of the perpetrator's criminal purpose and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime."

Jennings argues that the California Court of Appeal erred in relying on the jury verdict finding on the lying-in-wait special circumstance to conclude that the jury indeed found that he possessed an intent to kill. He notes that all parties stipulated that he was *not* the actual killer, and that contrary to the state appellate court's suggestion, "the jury did not make a conscious choice between the alternative bases for special circumstance liability, intent to kill versus major participant/reckless disregard."

In its opposition brief before this court, the state begins by asserting that the elements of special circumstances are purely issues of California state law. It argues that the California courts have the right to define state law, including the special circumstance, in any way they choose, and that Jennings has not shown that the state court's interpretation was unconstitutional.

In his supplemental brief, Jennings argues that the lying-in-wait special circumstance must be reversed and habeas relief granted because of the dual defects of constitutionally deficient evidence under *Jackson v. Virginia*, 443 U.S. 307, 321 (1979), and also because of a failure to instruct the jury on the element of intent required. He again reiterates that the lying-in-wait special circumstance instruction was phrased solely in terms of proof as to the actual killer, and also reiterates his related arguments set forth above.

In its supplemental brief, the state again argues that the intent required of an aider and abettor under the special circumstances statute is purely an issue of state law. It also contends that the jury finding of Jennings' intent to kill is evidenced not only by the verdict form, but also by the jury instruction. R.T. 6344, 6346, Vol. 53. It argues that the instruction clearly advised the jury that reckless indifference applied only to the felony murder special circumstance allegations, and that intent to kill and aiding and abetting were required for the lying-in-wait special circumstance. It further argues that the jury verdict forms demonstrated that the jury understood the difference. C.T. 2044, 2045, Vol. 8.

United States District Court

For the Northern District of California

1   The court concludes that both the trial court and the state appellate court erred

2   because the version of the lying-in-wait special circumstance under which Jennings was

3   convicted did require that, as a non-killer aider or abettor in the murder, he possess an

4   intent to kill.  The state appellate court's discussion on the issue is not particularly

5   substantial, and it did not specify in its decision which version of § 190.2 it was relying on.

6   It appears to this court that the state appellate court may have applied the pre-June 6,

7   1990, no-longer operative version of the lying-in-wait special circumstance statute and/or

8   case law specific to that earlier version of the statute.  As discussed, § 190.2(c) was

9   revised substantially just months before the crime occurred in this case.

10   The cases that the state appellate court relied on, *Beeman* and *Beardslee,* shed little

11   light on the precise issue here: whether or not the lying-in-wait special circumstance

12   required an intent to kill on the part of a non-killer aider and abettor.  *Beeman*, 35 Cal. 3d at

13   560; *Beardslee*, 53 Cal. 3d at 90.  First, *Beeman* was not a special circumstances case but

14   instead concerned the intent regarding aiding and abetting a crime generally.  35 Cal. 3d at

15   560.  In *Beeman*, the California Supreme Court held that "the weight of authority and sound

16   law require proof that an aider and abettor act with knowledge of the criminal purpose of

17   the perpetrator and with an intent or purpose either of committing, or of encouraging or

18   facilitating commission of, the offense."  *Id.*

19   Second, *Beardslee* concerned the pre-June 6, 1990 special circumstances statute.

20   53 Cal. 3d at 90.  Specifically, the *Beardslee* court interpreted § 190.2(b), the prior version

21   of 190.2(c).[12]  *Id.*  The *Beardslee* defendant had been convicted of two first-degree murders

22   and was sentenced to death.  The defendant challenged the jury instructions, arguing that

23

24   [12]As noted, section 190.2(b), subsection (c)'s predecessor, provided in pertinent part:

25    (b) Every person **whether or not the actual killer found guilty of
     intentionally aiding, abetting**, counseling, commanding, inducing, soliciting,
26   requesting, or assisting any actor in the commission of murder in the first degree
     shall suffer death or confinement in state prison for a term of life without the
27   possibility of parole, in any case in which one or more of the special
     circumstances enumerated in (1), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12),
28   (13), (14), **(15),** (16), **(17)**, (18), or (19) of subdivision (a) of this section has been
     charged and specially found under Section 190.4 to be true.

United States District Court

For the Northern District of California

1    to the extent his convictions were based on aiding and abetting the murder, the aiding and

2    abetting instructions did not require the jury to find that his aiding and abetting was done

3    with premeditation, deliberation, and express malice.  *Id.*  The court upheld the special

4    circumstance instruction, finding that it was sufficient that the instruction appropriately

5    "apprised the jury that if defendant did not actually kill either victim, its verdict of guilt of the

6    murder of that victim with special circumstances must be based on a conclusion that

7    defendant intended to encourage or facilitate the actual killer's first degree murder of the

8    victim."  *Id.*

9         The post-June 6, 1990 version of section 190.2(c) in effect at the time of Jennings'

10   crime requires a different consideration.  Because Jennings was not the actual killer, §

11   190.2(c) on its face requires a finding that an aider and abettor like Jennings "intend[ed] to

12   kill" the victim.  In other words, although Jennings was not required to personally carry out

13   the murderous act or acts for the lying-in-wait special circumstance to apply, *People v.*

14   *Bonilla*, 41 Cal. 4th 313, 331-32 (Cal. 2007), he was required to personally possess an

15   intent to kill in order for the jury to find as true the lying-in-wait special circumstance.

16        This conclusion, however, is not compelled by any of the cases cited by the parties.

17   The cases cited by the parties shed no light on the intent required of an aider or abettor

18   with respect to the lying-in-wait special circumstance.  In *People v. Edwards*, cited by

19   Jennings, the court held that with respect to the pre-June 6, 1990 lying-in-wait special

20   circumstance, it was not error for the state court to instruct the jury that the defendant, an

21   actual killer, need only possess a *mens rea* "the equivalent of premeditation *or*

22   deliberation."  54 Cal. 3d 787, 846 (Cal. 1991).  In addition to involving the prior statute,

23   *Edwards* was factually distinguishable from this case and did not speak to the intent

24   required of an aider or abettor at all.  Similarly, *People v. Stanley*, also cited by Jennings is

25   factually distinguishable, and concerned the intent required for murder committed by lying

26   in wait – not the intent required for an aider and abettor with respect to the lying-in-wait

27   special circumstance.  10 Cal. 4th 764, 794 (Cal. 1995).

28        The *Padilla* case cited by the state isn't more on point.  11 Cal. 4th at 932-35.  It was

United States District Court

For the Northern District of California

a murder for hire case.  The defendant and a companion hired someone else to commit a murder, and paid the killer a small amount of narcotics.  The court held that the financial gain special circumstance applied to the defendant even though his actions were not motivated by financial gain.  *Id.*  It reasoned that it was sufficient that the defendant intended to kill the victim, and that the killer he hired was motivated by financial gain (the narcotics).  *Id.*  The case did not involve a lying-in-wait special circumstance, and the intent required for the financial gain special circumstance is different than that for lying in wait, as the financial gain special circumstance required only that "the murder was intentional and was carried out for financial gain."  Cal. Penal Code § 190.2(a)(1).

By contrast, *all* of the cases that the court has located which speak to whether an aider or abettor must possess intent to kill in order for the jury to find true the lying-in-wait special circumstance - or a comparable non-felony murder special circumstance -  under the post-June 6, 1990 statute, confirm that intent to kill is required.  Of these nine cases, eight are California Court of Appeals decisions and one is a district court decision in a habeas case from the Southern District of California.  Seven of the eight state appellate court decisions are unpublished.  *See People v. Ybarra*, 166 Cal. App. 4th 1069, 1086 (Cal. Ct. App. 2008); *People v. Amante*, 2009 WL 2850354 at *13-15 (Cal. Ct. App. 2009); *People v. Manzanares*, 2010 WL 1006906 at *5 (Cal. Ct. App. 2010); *People v. Sanchez,* 2006 WL 2902690 at *2 (Cal. Ct. App. 2006) (noting that "[t]he special circumstance enumerated in section 190.2, subdivision (a)(15) applies to an aider and abettor who had the intent to kill" and that special circumstance could apply to defendant in that case who aided and abetted murder and who "clearly intended to kill the victim"); *People v. Portugal,* 2006 WL 290502 at *9 (Cal. Ct. App. 2006) (noting that "[t]he special circumstance enumerated in section 190.2, subdivision (a)(15) can apply to an aider and abettor who had the intent to kill"); *People v. Nourn*, 2004 WL 1067532 at *4-6 (Cal. Ct. App. 2004); *People v. Johnson*, 2003 WL 42502 at *10-12 (Cal. Ct. App. 2003); *People v. Weatherwax*, 2002 WL 31268238 at *4 (Cal. Ct. App. 2002) (noting with respect to defendant aider and abettor charged with first degree murder, "in order to prove the . . . lying-in-wait special

United States District Court

For the Northern District of California

1  circumstances, the prosecution had to prove that the defendant acted with the intent to kill")

2  ; *Johnson v. Woodford*, 2007 WL 1381603 at *9-12 (S.D. Cal. 2007); 3 Witkin & Epstein,

3  Cal. Crim. Law 3d, Punishment § 460 (2000 ed. & 2009 suppl.) (noting that § 190.2(d)

4  "creates an exception to the rule that an aider or abettor must have an intent to kill before

5  the death penalty may be imposed").

6      Accordingly, based on the version of § 190.2(c) in effect at the time of the murder in

7  this case, and contrary to the state appellate court's determination otherwise, this court

8  finds that the trial court erred when it instructed the jury with an incorrect version of CALJIC

9  8.80.1, which failed to advise the jury that in order to find as true the lying-in-wait special

10  circumstance, it was required to find that Jennings, a non-killer aider and abettor, intended

11  to kill the victim.

12      However, claims that a state court erred in interpreting state law are not cognizable

13  on federal habeas review.  *See, e.g.*, *Little v. Crawford*, 449 F.3d 1075, 1082 (9th Cir.

14  2006) (claim that state supreme court misapplied state law or departed from its earlier

15  decisions does not provide a ground for habeas relief).  Federal courts generally are bound

16  by a state court's construction of state laws, except when it appears that its interpretation is

17  an obvious subterfuge to evade the consideration of a federal issue.  *See Melugin v.*

18  *Hames*, 38 F.3d 1478, 1487 (9th Cir. 1994) (federal court bound by Alaska Court of

19  Appeals' interpretation and decision that state statute was properly applied to petitioner's

20  conduct); *see also Little*, 449 F.3d at 1083 (petitioner might have been able to show that

21  state supreme court's interpretation and application of state law was constitutional error if it

22  constituted "a fundamental defect which inherently resulted in a complete miscarriage of

23  justice," or "exceptional circumstances where the need for the remedy afforded by the writ

24  of habeas corpus is apparent").

25      Moreover, "habeas precedent places an 'especially heavy' burden on a defendant

26  who . . . seeks to show constitutional error from a jury instruction that quotes a state

27  statute." *Waddington v. Sarausad,* 129 S.Ct. 823, 831 (2009) (citing *Henderson v. Kibbe*,

28  431 U.S. 145, 155 (1977)).  Even if there is some ambiguity, inconsistency, or deficiency in

34

United States District Court

For the Northern District of California

the instruction, such an error does not necessarily constitute a due process violation. *Id.* Rather, the defendant must show both that the instruction was ambiguous and that there was "a reasonable likelihood" that the jury applied the instruction in a way that relieved the state of its burden of proving every element of the crime beyond a reasonable doubt. *Id.* (citing *Estelle*, 502 U.S. at 72). In making this determination, the jury instruction "may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record." *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). "The pertinent question is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *Id.* (quoting *Cupp*, 414 U.S. at 147).

However, if the disputed instruction is erroneous on its face, the "reasonable likelihood" standard employed for ambiguous jury instructions is not required. *Ho v. Carey*, 332 F.3d 587, 592 (9th Cir. 2003). If a jury instruction omits a necessary element of the crime, for example, constitutional error has occurred. *Id.* at 593 (finding jury instructions "erroneous" rather than ambiguous, where they included an uncorrected erroneous instruction that second-degree murder could be based on a finding of general intent, but also included an accurate description of the elements of second-degree murder, including specific intent); *see also Polk v. Sandoval,* 503 F.3d 903, 910 (9th Cir. 2007)).

Actual prejudice is still required before relief may be granted, however. *See Ho*, 332 F.3d at 595 (citing *Brecht*, 507 U.S. at 637); *see also Hedgpeth v. Pulido*, 129 S.Ct. 530, 532 (2008) (confirming that instructional error is subject to a harmless error analysis); *Byrd v. Lewis*, 566 F.3d 855, 866 (9th Cir. 2009). The omission will be found harmless unless it "'had substantial and injurious effect or influence in determining the jury's verdict.'" *California v. Roy*, 519 U.S. 2, 4 (1996) (quoting *Brecht*, 507 U.S. at 637). Where the trial court fails to alert the jurors that they must consider an element of the crime, the omission is harmless if review of the facts found by the jury establishes beyond a reasonable doubt that the jury necessarily found the omitted element. *See United States v. Lin*, 139 F.3d 1303, 1309 (9th Cir. 1998) (error harmless if no rational jury would have made the findings without also finding missing element of the crime). But if the reviewing federal habeas

United States District Court

For the Northern District of California

court is in grave doubt as to whether the error had substantial and injurious effect or influence in determining the jury's verdict, the petitioner is entitled to the writ.  *See Evanchyk v. Stewart*, 340 F.3d 933, 940-42 (9th Cir. 2003); *Ho*, 332 F.3d at 595-96.

Here, the trial court's instruction regarding CALJIC 8.80.1 was not simply ambiguous, nor did it parrot the operative version of § 190.2(c).  This case is therefore not controlled by *Sarausad*.  Instead, the instruction was erroneous on its face because it eliminated an element of the lying-in-wait special circumstance under the post-June 6, 1990 version of § 190.2(c) - that Jennings, a non-killer, possess an intent to kill.  *See Ho*, 332 F.3d at 592.

The next inquiry is therefore whether the error in the jury instruction was prejudicial. Based on the jury instructions as a whole, the closing arguments, and the verdict forms, the court is unable to discern from the record whether the jury in this case found that Jennings himself possessed an intent to kill with respect to the lying-in-wait special circumstance.  Here, the prosecution set forth theories against Jennings that involved both reckless indifference and an intent to kill.  In its closing argument, based primarily on the codefendants' statements and Jennings' association with his codefendants, the prosecution repeatedly argued that Jennings - along with his codefendants - intended to kill Madden and was aware of a plan to kill Madden.  *See* R.T. 6368; 6369; 6370; 6372; 6374; 6377; 6387; 6390; 6391.  However, the prosecution also argued that Jennings acted with reckless indifference and as a major participant.  R.T. 6408-09.  Moreover, in discussing the special circumstances, in its opening and rebuttal closing arguments, the prosecution conflated the standards required to find true all three special circumstances.  It suggested several times that Jennings could be found guilty of the lying-in-wait special circumstance if he was a major participant acting with reckless indifference (allowed with respect to the felony murder special circumstances).  R.T. 6408-6410; 6493.  The prosecution itself further recognized the problems with proving intent to kill in its state court appellate brief.  *See* Exh. B at 64 ("[t]he primary problem with proof for the prosecution was to show that appellant was aware of, and shared in the intent to kill Madden before the group traveled to

United States District Court

For the Northern District of California

1   [LeeWards] on the evening of the killings").

2       Nor did the other jury instructions clarify that as an aider and abettor non-killer, a fact

3   that was undisputed, the jury could not find true the lying-in-wait special circumstance

4   unless Jennings possessed an intent to kill.  The court instructed the jury under CALJIC

5   No. 3.01, the definition of aiding and abetting, which does require that the jury find that the

6   aider and abettor encouraged the commission of the crime with knowledge of the unlawful

7   purpose of the perpetrator and with the intent to encourage or facilitate the commission of

8   the crime.  However, CALJIC 3.01 does not state that for the lying-in-wait special

9   circumstance finding, Jennings needed to possess an intent to kill.

10      The trial court also instructed the jury pursuant to CALJIC No. 8.83.1 regarding the

11  intent necessary to prove the special circumstance of lying in wait.   *See* C.T. 1940.  Like

12  CALJIC 3.01, CALJIC 8.83.1 also did not state that in order to find as true the lying-in-wait

13  special circumstance, Jennings needed to possess an intent to kill. *Id.* at 5-6.  Thus, the

14  jury could have been left with the belief that the lying-in-wait special circumstance could

15  have been found true based merely on Jennings' intent to aid and abet his codefendants

16  who themselves possessed an intent to kill.

17      Nor can the court conclude that the verdict form demonstrates that the jury indeed

18  found Jennings possessed the necessary intent with respect to the lying-in-wait special

19  circumstance.  The verdict form provided with respect to the "First Special Circumstance

20  Allegation: Murder While Lying in Wait:"

21      We, the jury, having found the defendant, MATTHEW GEORGE JENNINGS,
        guilty of Murder in the First Degree, find the First Special Circumstance
22      Allegation that the defendant, MATTHEW GEORGE JENNINGS, intentionally
        killed James Madden while lying in wait to be TRUE.
23

24  C.T. 2044.  However, in evaluating the elements necessary for the special circumstance

25  finding, the jury was guided by the erroneous instruction.

26       Accordingly, because this court has serious doubts as to whether the error had a

27  substantial and injurious effect or influence in determining the jury's finding on the lying-in-

28  wait special circumstance, it concludes that the state appellate court's decision involved an

United States District Court

For the Northern District of California

1  unreasonable application of, clearly established federal law, and grants habeas relief based

2  on the challenged jury instruction.  *See Brecht*, 507 U.S. at 637.

3      Given the court's conclusion that Jennings is entitled to habeas relief because the

4  lying-in-wait jury instruction violated his due process rights, the court finds it unnecessary to

5  reach Jennings' remaining argument that the evidence supporting the lying-in-wait special

6  circumstance was insufficient.

7      **D.    Felony Murder Special Circumstances Claim**

8      The court addressees Jennings' due process claim regarding the sufficiency of the

9  evidence supporting the felony murder special circumstance below in conjunction with its

10  discussion of the Confrontation Clause issue.  For reasons explained in more detail below,

11  the two issues are substantially overlapping because in considering whether any

12  Confrontation Clause violation constituted harmless or prejudicial error, the court is

13  required necessarily to also consider the sufficiency of the evidence supporting the felony

14  murder special circumstances.

15  **III.   Jennings' Confrontation Clause and Felony Murder Special Circumstances Claims**

16

17      **A.    The Admission of Jennings' Codefendants' Statements Violated His Confrontation Clause Rights**

18          **1.    State Court Proceedings and Rulings**

19      As noted, following their arrests, three of Jennings' codefendants, Silveria, Spencer,

20  and Travis, confessed to details of the crimes.  The prosecution proposed to introduce

21  significant portions of their confessions against Jennings at his separate trial as statements

22  against declarants' penal interests under California Evidence Code § 1230.[13]  After

23  Jennings objected on several bases, the trial court held a lengthy hearing and very

24  conscientiously determined the admissibility of the proffered codefendants' statements line-

25  by-line.  R.T. 4005-4525, Vols. 42-44.  The trial court subsequently allowed the admission

26  _____

27      [13]The parties agreed before the trial court that the statements were not admissible as coconspirator's statements under California Evidence Code § 1223 because they were made
28  after the codefendants' arrests, and therefore were not made while participating in or in furtherance of the conspiracy.  R.T. 4005, Vol. 42.

United States District Court

For the Northern District of California

of portions of the statements, finding generally that they were admissible as statements against the declarants' interests under California Evidence Code § 1230.  Santa Clara Police Sergeant Stewart Cuisimano read the statements into the record at trial.  R.T. 6095-6217.

Jennings challenged the trial court's admission of certain portions of the statements before the state appellate courts on appeal, arguing that the trial court erred in admitting the statements because they were not on their face declarations against the declarants' penal interests.  Jennings argued that several of the statements were inculpatory to him, and that the statements were unreliable both individually and collectively because they were replete with internal inconsistencies and simply represented "thieves falling out."

Jennings challenged the admission of the following statements on appeal.[14]

### a.   **Spencer Statements**

#### i.   *Premeditation (Spencer 1)*

Sgt.  Keech: Before you went over there, you were talking about setting the place on fire, right?  Wasn't that discussed?

Spencer:    Yeah, that was discussed

Sgt.  Keech: It was also discussed about killing him [Madden].  You talked about it, at least talked about it right?

Spencer:    Yeah.

Sgt.  Keech: Who talked about it?

Spencer:    John and Danny.

Sgt.  Keech: What did they say?

Spencer:    Said they gotta kill him.

Sgt.  Keech: Gotta kill him why?

Spencer:    Because he knows them.

---

[14]The court rejects any attempt by Jennings, inadvertent or otherwise, to enlarge the scope of or alter the statements to which he objects to in his briefs before this court, including his supplemental traverse, beyond those explicitly presented to the state courts on appeal.

1   Sgt.  Keech:  Okay.  So John and Danny said they had to kill him because he knows them?

2   Spencer:       Yeah.

3   R.T. 6100.

4                            **ii.      *Jennings' Location during Crimes (Spencer 2)*

5   Sgt.  Keech:  What did Matt [Jennings] and what did Troy [Rackley] do during this whole

6                          thing?

7   Spencer:       Stand guard.

8   Sgt.  Kecch:  Where at?

9   Spencer:       Troy's looking out the front – I'm sorry – Troy's looking out front and Matt

10                        [Jennings] went out back and started the car.

11  R.T. 6105.

12                           **iii*.      *Planning the Robbery/Further Premeditation
                                          (Spencer 3)*[15]

13  Sgt.  Keech:  **Where were you guys first at when, uh, Danny [Silveria] and John**
14                        **[Travis] first started talking about robbing . . . LeeWards?  Do you**
15                        **remember?**

16  Spencer:       **Up in the mountains.**

17  Sgt.  Keech:  **This Uvas?  What did they say?**

18  Spencer:       **That they wanted to hit LeeWards.**

19  Sgt.  Keech:  **And what else did they say?**

20  Spencer:       **That they had to kill him because they knew him, he knew them.**

21  Sgt.  Keech:  **And they had to kill him because he knew them.  Now, how much did**
22                        **you guys plan it out?**

23  Spencer:       **Not very much.**

24  R.T. 6109.

25  ////

26

27  _____

28          [15]The  highlighted  and  boldened  statements  are  those  that  the  court  finds  most
       problematic as discussed below.

United States District Court
For the Northern District of California

1      **b.      Silveria Statement**

2   Sgt.  Keech:  Again, when did you and John [Travis] first, you know, really plan that you

3              were gonna do this?

4   Silveria:    Uh, oh, shit, we started getting really ser— couple of months after we worked

5              there.  Uh, we seen what kind of cash flow came in there.  And I discussed,

6              you know, and one of these days it would be nice, it would nice, you know, to

7              do something like this.  Or one of these days we're gonna, you know, we're

8              gonna rob Jim [Madden], not we're gonna kill Jim [Madden].

9   Sgt.  Keech:  Uh-huh.

10  Silveria:    Just the last couple weeks, the last months he started talking about this.

11             We'll set him on fire, you know, we'll – we'll cut him, we'll shoot him, we'll do –

12             we'll shock him, we'll do whatever we have to do and, uh, I wouldn't, I mean,

13             be on the outside.  I was going, you know, oh, sure, you know, yeah, yeah.

14             When it came to – when it came time for, you know, him to hand me that

15             knife, that was the hardest thing I ever did.  I don't know why I did it.

16  Sgt.  Keech:  **When did you guys, uh, decide to do it last night?**

17  Silveria:    **Uh, we were prolonged.  We were gonna do it Sunday night.  Went by**

18             **and checked it out, it was closed.  *Everybody was gone.  So we decided***

19             ***to do it – we – we talked to everybody that was in there and, uh, you***

20             ***know what I'm saying, yeah, okay.  We're gonna kill him, we're gonna***

21             ***kill him, we're gonna kill him.  Everybody and anybody including me,***

22             ***okay?  Okay, fine, we're going [sic] kill him.*  When it came down to it**

23             **when I felt we were ready to go, I said, let's go.  I don't know which way**

24             **– he said something inaudible – I don't know if we started walking out**

25             **the building or not, but I just never looked back.  John turned around**

26             **and gave me – he's all, no.**"

27  R.T. 6136-37.

28  ////

41

**United States District Court**

For the Northern District of California

1

        **c.**     **Travis Statement**

2

             **i.**     ***First Segment (Travis 1)***

3    Travis:       We started – it all started at Uvas when we all got drunk and got loaded and

4                   we decided we wanted some money.  So me and Danny knew there was

5                   money in that safe 'cause we used to work there.  So we went over there, all

6                   of us went over there and we waited till Jim came out the back door and we

7                   rushed him.  And we made him turn off the alarm and then we took his

8                   money, then we stabbed him.

9    Sgt.  Keech: Who stabbed him?

10    Travis:       Chris [Spencer] stabbed him first in the chest and slit his throat. . . .

11    Sgt.  Keech: and. . . .

12    Travis:       Then I stabbed him.

13    Sgt.  Keech: And then?

14    Travis:       And then Danny [Silveria] stabbed him.

15    Sgt.  Keech: ==*Matt [Jennings] and Troy [Rackley]?*==

16    Travis:       ==*Matt was going to hit him over the head with a crowbar before the*==

17                   ==*stabbing.*==

18    Sgt.  Keech: ==*Never did though, huh?*==

19    Travis:       ==*Never did.*==

20    R.T. 6198-6199.

21

             **ii.**     ***Second Segment (Travis 2)***

22    Sgt.  Keech: So I mean basically when you went over there, you knew that you couldn't

23                   leave him alive?

24    Travis:       Right.

25    Sgt.  Keech: What – what kind of weapon did you have?

26    Travis:       I used Chris' [Spencer's] knife.

27    Sgt.  Keech: Okay.  But when you went first there?

28    Travis:       I didn't have no weapon.

United States District Court

For the Northern District of California

1  Sgt. Keech: Okay.  Chris had a knife?

2  Travis:       **Chris [Spencer] had a knife, *Matt [Jennings] had a crowbar*, Danny**

3              **[Silveria] had the gas which we stuck behind the trailer, and Troy**

4              **[Rackley] had a nail puller.**

5  R.T. 6200-6201.

6                         iii.     ***Third Segment (Travis 3)***

7  Sgt. Keech: **Okay.  Now you knew when you went over there last night, you knew**

8              **that you had to kill Jim?**

9  Travis:       **Oh, oh, definitely.**

10 Sgt. Keech: It was just a question of how you were going to do it?

11 Travis:       Said [inaudible] Chris [Spencer], he goes, I'll kill him, I'll kill him.  I said all

12             right.

13 R.T. 6213.

14                        iv.     ***Fourth Segment (Travis 4)***

15 Sgt. Keech: **Well, you know before, you knew before you even got there that's what**

16             **you were going to do?**

17 Travis:       **Right.**

18 Sgt. Keech: **Now, did — you went over the day before in fact, right?**

19 Travis:       **Yeah.**

20 Sgt. Keech: **So I mean the bottom line is when you went over there you went to get**

21             **the money, you knew you had to kill him?**

22 Travis:       **Uh huh.**

23 Sgt. Keech: **You – you had two missions, one was to get Jim and the other one was**

24             **to get the money, huh?**

25 Travis:       **Yeah.**

26 R.T. 6215-6216.

27         The state appellate court affirmed the trial court's admission of the statements under

28 both state and federal law.  In its April 11, 2001 decision (following remand from the

43

United States District Court

For the Northern District of California

California Supreme Court), it recognized the United States Supreme Court's intervening decision in *Lilly*, 527 U.S. at 123-24, and noted that the issue of "fundamental concern" in both *Lilly* and on appeal in Jennings' case was the fact that the codefendants' statements were admitted "as evidence offered by the prosecution to establish the guilt of an alleged accomplice of the declarant." Exh. G at 23. The appellate court then considered the statements declarant-by-declarant, as opposed to statement-by-statement like the trial court did. As such, the appellate court did not address each individual statement.

As for Spencer, the appellate court found that he clearly incriminated himself, thus making his statement against his penal interest. It noted that there was only one small portion of Spencer's statement that even referenced Jennings - the portion in which Spencer stated that Jennings was outside during the incident (Spencer 2). The court noted that Jennings actually requested that Spencer 2 be admitted, and thus waived any objection on appeal.

Turning to Silveria, the appellate court similarly found that the statement was against his penal interest, determining that he "powerfully incriminated himself." It found that Silveria's use of "we" could reasonably be interpreted to refer only to Silveria and Travis. In sum, it held that Silveria's statement did not include evidence that was inculpatory to Jennings.

Finally, regarding Travis, the court again found that his statement was inculpatory and against Travis' penal interests. The court noted that the statement did indeed incriminate Jennings, asserting that Jennings was going to hit the victim in the head with a crowbar (Travis 1). However, given the fact that this statement was followed with Travis' admission that Jennings "never did" hit Madden, the court reasoned that the statement as a whole actually minimized Jennings' participation in the crime. It ultimately concluded that the statement was more exculpatory than inculpatory to Jennings.

### 2.    Legal Standards

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses

United States District Court

For the Northern District of California

against him." U.S. Const. amend. VI. "The central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversarial proceeding before the trier of fact." *Lilly*, 527 U.S. at 123-24 (quoting *Maryland v. Craig*, 497 U.S. 836, 845 (1990)).  When the prosecution seeks to introduce statements of a declarant who is unavailable at trial, the courts must decide whether the Confrontation Clause permits the state to deny the accused his usual right to force the declarant to submit to cross-examination. *Id.* at 124.

Under clearly-established Supreme Court authority at the time of Jennings' conviction, the Confrontation Clause did not preclude the use of hearsay evidence against a criminal defendant if the declarant was unavailable at trial, and the hearsay bore "adequate indicia of reliability."[16]  *Ohio v. Roberts*, 448 U.S. 56, 66 (1980).  A statement bears sufficient indicia of reliability if: "(1) the evidence falls within a firmly rooted hearsay exception, or (2) it contains particularized guarantees of trustworthiness such that adversarial testing would be expected to add little, if anything, to the statement's reliability." *Lilly*, 527 U.S. at 125; *Roberts*, 448 U.S at 66.

A hearsay exception is " 'firmly rooted' if, in light of longstanding judicial and legislative experience, . . . it rests on such a solid foundation that admission of virtually any evidence within it comports with the substance of the constitutional protection." *Lilly*, 527 U.S. at 126 (quoting *Roberts*, 448 U .S. at 66).   A "firmly rooted hearsay exception" is a

---

[16]As noted, after this case was fully briefed, the United States Supreme Court held that the Confrontation Clause forbids admission in a criminal trial of an out-of-court testimonial statement by a witness who does not testify, unless the witness is both unavailable and the defendant had a prior opportunity to cross-examine him. *Crawford*, 541 U.S. at 68-69.   In *Crawford,* the Supreme Court rejected *Roberts*' "indicia of reliability" test with respect to testimonial statements -- such as prior testimony and custodial interrogations – holding that the Confrontation Clause does not permit the introduction of such statements unless the declarant is both unavailable at trial and the defendant had a prior opportunity to cross-examine the declarant.   541 U.S. at 59.   The Court expressly distinguished, for Confrontation Clause purposes, "nontestimonial" hearsay, stating that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framer's design to afford the States flexibility in their development of hearsay law – as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." *Id.* However, the Supreme Court subsequently clarified that *Crawford* does not apply retroactively to this habeas case. *Whorton*,  549 U.S. at 421.

United States District Court
For the Northern District of California

category of statements which over time has proven trustworthy and is widely accepted as such among various jurisdictions and which inherently carries "'special guarantees of credibility' essentially equivalent to, or greater than, those produced by the Constitution's preference for cross-examined trial testimony." *Id.* Whether or not "statements fall within a firmly rooted exception for Confrontation Clause purposes is a question of federal law." *Id.* at 125.

Alternatively, "[p]articularized guarantees of trustworthiness" must be evident in the statement itself. *Id.* at 138. The hearsay evidence "must possess indicia of reliability by virtue of its inherent trustworthiness, [and] not by reference to other evidence at trial." *Id.* (quoting *Idaho v. Wright*, 497 U.S. 805, 822 (1990)). "The 'particularized guarantees of trustworthiness' required for admission under the Confrontation Clause must . . . be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." *Id.* (quoting *Idaho*, 497 U.S. at 820). Specifically, courts look to the circumstances in which the incriminating statement is made (i.e. in custody or in a private setting), to whom it is made (i.e. law enforcement as opposed to a friend or confidant), and the nature of the statement itself (i.e. whether the statement is inculpatory or shifts blame or responsibility to someone else) when evaluating its reliability for Confrontation Clause purposes. *See Roberts*, 448 U.S. at 66; *Padilla v. Terhune*, 309 F.3d 614, 618 (9th Cir. 2002) (applying *Roberts*' second prong to declarations against interest).

In *Lilly*, a plurality of the Supreme Court held that where a declaration against penal interest involves an accomplice's confession that inculpates a criminal defendant, it does *not* constitute a firmly rooted hearsay exception. 527 U.S. at 126-27. The defendant in *Lilly* (Benjamin Lilly), his brother (Mark Lilly), and his brother's roommate (Gary Barker) committed a series of crimes – robberies, burglaries, and a car-jacking. The victim of the car-jacking was murdered. The police obtained a confession from Mark, who, while implicating himself in the robberies, stated that it was Benjamin and Barker who got the guns. He also told police that it was Benjamin who instigated the car-jacking and shot the

United States District Court
For the Northern District of California

1  victim, and that he (Mark), "didn't have nothing to do with the shooting." *Id.* at 121. The trial

2  judge admitted Mark's taped confession against Benjamin on the grounds that Mark's

3  out-of-court statement fell within an exception to the hearsay rule for statements against

4  penal interest.

5       A plurality of the Supreme Court reversed, noting that:

6       [t]he "against penal interest" exception to the hearsay rule – unlike other
        previously recognized firmly rooted exceptions – is not generally based on the
7       maxim that statements made without a motive to reflect on the legal
        consequences of one's statement, and in situations that are exceptionally
8       conducive to veracity, lack the dangers of inaccuracy that typically
        accompany hearsay. The exception, rather, is founded on the broad
9       assumption "that a person is unlikely to fabricate a statement against his own
        interest at the time it is made."

10 527 U.S. at 126-27 (citation omitted).

11      It explained that, due to the sweeping scope of the label, the category of

12 "'declaration[s] against penal interest' . . . defines too large a class for meaningful

13 Confrontation Clause analysis." *Id.* at 127 (quoting *Lee v. Illinois*, 476 U.S. 530, 544 n. 5

14 (1986)). Therefore, the plurality divided the exception into three subcategories, based on

15 the three principal situations in which declarations against penal interest are offered as

16 evidence in criminal trials: (1) voluntary admissions against the declarant; (2) exculpatory

17 evidence offered by a defendant who claims that the declarant committed, or was involved

18 in, the offense; and (3) evidence offered by the prosecution to establish the guilt of an

19 alleged accomplice of the declarant. *Id.*

20      The plurality concluded that the statements in *Lilly* fell into the third category, which

21 was not a firmly rooted exception to the hearsay rule because "when an alleged accomplice

22 testifies, his confession that 'incriminate[s] himself together with the defendant . . . ought to

23 be received with suspicion, and with the very greatest care and caution, and ought not to

24 be passed upon by the jury under the same rules governing other and apparently credible

25 witnesses.' " *Id.* at 131 (quoting *Crawford v. United States*, 212 U.S. 183, 204 (1909)); *see*

26 *also id.* at 133 ("It is clear that our cases consistently have viewed an accomplice's

27 statements that shift or spread the blame to a criminal defendant as falling outside the

28

47

United States District Court

For the Northern District of California

realm of those hearsay exception[s] [that are] so trustworthy that adversarial testing can be expected to add little to [the statements'] reliability.").

The *Lilly* Court found that it was "abundantly clear that neither the words that Mark spoke nor the setting in which he was questioned provide[d] any basis for concluding that his comments regarding petitioner's guilt were so reliable that there was no need to subject them to adversarial testing in a trial setting." *Id.* at 139. In support, the Court noted that

> Mark was in custody for his involvement in, and knowledge of, serious crimes and made his statements under the supervision of governmental authorities. He was primarily responding to the officers' leading questions, which were asked without any contemporaneous cross-examination by adverse parties. Thus, Mark had a natural motive to attempt to exculpate himself as much as possible. Mark also was obviously still under the influence of alcohol.

*Id.* The Court therefore concluded that each of the above factors militated against finding that Mark's statements were so inherently reliable that cross-examination would have been superfluous. *Id.* Following the Supreme Court's decision in *Lilly*, the Ninth Circuit in *Hernandez v. Small* addressed accomplices' statements, and affirmed the state court's admission of those statements that it concluded inculpated only the declarant and not the petitioner as well. 282 F.3d 1132 (9th Cir. 2002).

The petitioner in *Hernandez* was convicted of first degree murder, second degree murder, attempted murder, and second degree robbery. *Id.* at 1135. The convictions arose from two separate incidents that took place on the same day. *Id.* Petitioner, while with a fellow gang member – the declarant/accomplice, shot and killed two victims, one of whom was a rival gang member, and attempted to kill a third person. *Id.* Both the petitioner and codefendant gave statements to the police upon their arrests. *Id.* at 1136. The petitioner admitted to his involvement, but defended that he was under the influence of drugs at the time. *Id.* Among other statements, his codefendant asserted that one of the reasons that he had ridden a bicycle with the petitioner to the market – the site of one of the murders -- was to steal a car. *Id.*

The trial court permitted the prosecution to introduce the codefendant's statement regarding his reasons for his going to the market, but excised any reference to the

United States District Court
For the Northern District of California

1  petitioner.  *Id.*  The *Hernandez* petitioner nevertheless objected, arguing that its admission

2  violated his Confrontation Clause rights.  *Id.*  The state trial court concluded that because

3  the statement constituted a declaration against the codefendant's penal interests, it was

4  admissible and would not violate petitioner's Sixth Amendment rights because it constituted

5  a firmly rooted hearsay exception, and the state appellate courts affirmed.  *Id.*  In support,

6  the California Court of Appeal noted that petitioner's accomplice's statement had been

7  redacted to remove any reference to the petitioner, and also found that the statement

8  inculpated only the declarant and not the petitioner.  *Id.* at 1140.

9          In upholding the state court decision on habeas review, the Ninth Circuit noted that

10  the state appellate court rendered its decision prior to the Supreme Court's decision *Lilly*,

11  which explained why the state court had not engaged in a categorical analysis as set out in

12  *Lilly*.  *Id.*  The Ninth Circuit then distinguished the accomplice statement in *Hernandez* from

13  that in *Lilly,* noting that the *Hernandez* accomplice's statement inculpated only himself (the

14  declarant), and not the petitioner.  *Id.* at 1142.  The Ninth Circuit concluded that the state

15  court's decision was therefore not unreasonable because *Lilly* "did not involve statements

16  like [the *Hernandez* accomplice's] which inculpate only the accomplice, and indeed are

17  sanitized to exclude any reference to the defendant."  *Id.*

18          Importantly, the Ninth Circuit interpreted *Lilly* to speak only to "a further subset of

19  statements" within the "subcategory" of "statements made by an accomplice offered as

20  evidence by the prosecution to establish the guilt of the defendant."  *Id.*  It held that that

21  particular subset – one in which a nontestifying accomplice's statements are against his

22  penal interests *and* inculpate the accused -- is the only one that *Lilly* deemed inherently

23  untrustworthy.  *Id.* at 1141-42.   The Ninth Circuit concluded that an accomplice statement

24  that inculpates the accomplice only was not deemed inherently untrustworthy by *Lilly*.  *Id.*

25  at 1142-43.   The *Hernandez* court reasoned that

> In such cases the [declarant] has no motive to lie; he is not trying to
> exonerate himself or to shift or spread blame.  He is simply talking about
> himself.  Such statements, which are purely against the accomplice's penal
> interests, are thus qualitatively different from statements which, while at least
> partially against an accomplice's penal interest, also inculpate the defendant.

49

*Id.* at 1143. In ultimately concluding that the state appellate court's decision was not unreasonable, the *Hernandez* court also raised a question regarding whether or not *Lilly* - a plurality decision - constituted clearly-established federal law. *Id.*

However, following its decision in *Hernandez*, the Ninth Circuit in *Forn v. Hornung* held that *Lilly* was binding law in habeas cases even though it was a plurality decision. 343 F.3d 990, 995 n .4 (9th Cir. 2003). In *Forn*, the petitioner was convicted of conspiring with and soliciting his codefendant to murder one of his former business associates. *Id.* at 991. After his arrest, the codefendant gave a confession that incriminated both himself and the petitioner in the murder scheme. *Id.* at 992-94. The trial court admitted the statement at the petitioner's trial under the "against penal interest" hearsay exception. *Id.* at 994. The California Court of Appeal affirmed, finding that the codefendant/declarant's statement was reliable even though he was seeking leniency in the course of his interview with police because the declarant "equally" inculpated himself, and was therefore subjecting himself to "third-strike" liability. *Id.* at 997.

The Ninth Circuit, however, held that the state court's reliability determination was unreasonable. It held that the facts of the case were "virtually indistinguishable" from *Lilly*, and that the nature of the codefendant's statements and the circumstances under which they were made "did not possess such guarantees of trustworthiness," and that "cross-examination [was] essential." *Id.* at 996. The Ninth Circuit recognized that the *Forn* declarant differed from the *Lilly* declarant in that unlike the *Lilly* declarant, the *Forn* declarant/codefendant was not trying to make himself look blameless, but instead "admitted to a significant role in the alleged plan to murder [the victim]." *Id.* at 997. Nevertheless, the Ninth Circuit held that the *Forn* declarant's incrimination of himself in addition to the petitioner did not make the statements reliable. *Id.* at 997-98.

The Ninth Circuit reasoned that in spite of the differences in the statements, the ultimate goals of the *Lilly* and *Forn* codefendants/declarants were the same. *Id.* at 997. It noted that the *Forn* declarant's confession was "imbued with self-interest," and concluded that "he was positioning himself to become 'important' to the investigation and the

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  prosecution of the petitioner. *Id.* at 998.  The court held that it was "folly in concluding that

2  an accomplice's statements are trustworthy because they implicate him as well [as the

3  defendant]." *Id.*  It noted that the "one of the most effective ways to lie is to mix falsehood

4  with truth, especially truth that seems particularly persuasive because of its self-inculpatory

5  nature." *Id.* (quoting *Williamson v. United States*, 512 U.S. 594, 599-600 (1994)).  Noting

6  that the plurality in *Lilly* was concerned not only with "shifting blame" but also with

7  "*spreading* blame," the Ninth Circuit held that this could include "making statements that are

8  both exculpatory and inculpatory at the same time." *Id.*  The court concluded that

9  admission of the statements was not justified "by cases that allow the admission of

10  statements which in no way attempted to shift blame to another or curry favor at the

11  expense of others." *Id.* at 998.

12      The *Forn* court ultimately concluded that because the codefendant's statement "was

13  made in police custody, was not truly against his interest, and was made with an apparent

14  motive to fabricate or exaggerate, there [was] nothing to support its trustworthiness, and its

15  admission without an opportunity to cross-examine [the codefendant] violated [the

16  petitioner's] rights under the Confrontation Clause." *Id.* at 999.

17          **3.      Parties' Arguments**

18      Jennings filed his federal habeas petition pro se, and, unfortunately, his opening

19  papers failed to develop his arguments associated with this claim at all, let alone in the

20  detail contained in his state court petition for review.  Accordingly, in order to fully

21  understand his arguments on this issue, it was necessary for this court to review Jennings'

22  petition filed with the California Supreme Court.

23      In his petition for review before the California Supreme Court, Jennings argued that

24  on reconsideration, the California Court of Appeal did not adequately reconsider its prior

25  opinion in light of *Lilly* as previously mandated by that court.  He contended that although

26  the court set forth the holding in *Lilly,* it nevertheless simply reiterated its prior reasoning

27  and conclusion on the issue without really applying *Lilly* to the facts of his case.  Jennings

28  argued that nearly *all* of the factors identified by the United States Supreme Court in *Lilly* as

United States District Court

For the Northern District of California

1   indicators of a lack of trustworthiness were present in connection with his codefendants'

2   statements.  Specifically, Jennings noted that his codefendants' statements were taken

3   while they were in police custody and aware of the severe repercussions they faced; that

4   the confessions were inconsistent in parts; and that the confessions attempted to shift

5   culpability in parts to other defendants.

6        Jennings contended that the California Court of Appeal erroneously downplayed the

7   inculpatory nature of some of the statements, noting specifically Travis' statement that

8   Jennings was going to hit the victim over the head with a crowbar (Travis 1).  Jennings

9   argued that this statement was highly inculpatory to him even though Travis subsequently

10  admitted that Jennings never did actually hit the victim.

11       Regarding Silveria's statement, Jennings contended that the California Court of

12  Appeal erred in finding that it was obvious that the pronoun "we" was limited to Silveria and

13  Travis.  Jennings argued that Silveria's mention of "everybody and anybody" in other

14  portions of his statement implied that "we" actually included Jennings and the other

15  codefendants, and therefore was inculpatory to him.  Finally, Jennings argued that the state

16  court of appeal was incorrect that he had waived his appeal as to each and every portion of

17  Spencer's statements.[17]

18       In its November 2, 2002 opposition to Jennings' habeas petition, the state contends

19  that Jennings never "seriously contested" that he was part of the "gang" that included

20  Spencer, Travis, and Silveria, and that he was involved in the planning and execution of the

21  robbery.  The state asserts that Jennings' defense was instead that only a robbery – not a

22  murder - was contemplated, and that he did not actually participate in the murder.

23  Accordingly, the state adds that Jennings did not object to (and actually sought) the

24  admission of portions of his codefendants' statements that he did not participate in the

25  murder and that specified that he was outside when the murder occurred.

26  ────────────────

27       [17]The state did not file an opposition or response to Jennings' petition for review, and as noted above, the California Supreme Court subsequently issued a postcard denial of

28  Jennings' petition for review, so there is no written, reasoned decision addressing Jennings' arguments.

1    In terms of other portions of the statements regarding the premeditation and

2  planning of the offense, the state argues that those portions were actually the "most plainly

3  admissible" because they did not mention Jennings by name.  The state contends that

4  under *Lilly*, the challenged statements fell into the category of statements that inculpated

5  both the declarant and the defendant - and *not* the category of statements that shifted the

6  blame and were directly inculpatory to the nondeclarant.  The state argues that unlike the

7  latter category, which the *Lilly* plurality deemed unreliable, the former category - those that

8  inculpate both the declarant and defendant - was not condemned by the *Lilly* court.

9  Moreover, the state argues that because *Lilly* produced a plurality decision, as opposed to

10  a majority opinion, it is not clearly established law for AEDPA purposes.  Accordingly, the

11  state then proceeds to analyze the trustworthiness of the codefendants' statements under

12  *Roberts*, 441 U.S. at 66, *Lilly*'s predecessor.  The state then addresses the challenged

13  statements in groups.

14    As for Spencer 3, the state argues that this portion of Spencer's statement merely

15  demonstrates that *Spencer* was aware that Travis and Silveria contemplated killing

16  Madden.  It argues that it is trustworthy because it is incriminating to Spencer.  The state

17  further argues that Spencer's statement that the group – referred to as "you guys" (Spencer

18  3) – did not do much planning of the murder, is actually helpful to Jennings.

19    Regarding Silveria's statement, the state asserts that the first part of the statement is

20  not incriminating to Jennings, but instead is highly incriminating to Silveria because it

21  concerns when Silveria and Travis first planned to kill Madden.  As for the portion of

22  Silveria's statement, in which Silveria admitted that "we talked to everybody" and told them

23  they were going to kill Madden, the state argues that the fact that Silveria identified others

24  should not be viewed as an attempt by Silveria to shift the blame.  It even contends that

25  since Silveria had already admitted that Jennings left the office when the bloodshed began

26  (a statement that is not contested or objected to by Jennings), his statement somehow also

27  decreased Jennings' blame, and that considering Silveria's statements as a whole, the

28  state court's decision was not unreasonable.

United States District Court

For the Northern District of California

1    Turning to Travis, the state argues that only one of the four portions of the

2  challenged statements is controversial, and points to Travis 1 in which Travis stated that

3  Jennings was going to hit Madden over the head with a crowbar before the stabbing.  The

4  state argues that the statement "only minimally spreads blame for [Madden's] murder" and

5  is trustworthy because it is actually more inculpatory to Travis than Jennings since Travis

6  subsequently admitted that Jennings did not actually hit Madden, and because Travis

7  "identified a potential witness. . . who was less culpable than himself."

8    In sum, the state argues that all of the statements were admissible, even under *Lilly*.

9  It emphasizes that the state appellate court did not find that the statements were admissible

10  because they fell into a firmly rooted hearsay exception, but instead because they were

11  trustworthy under *Roberts*.  441 U.S. at 66.  As for the "small portion" of the statements that

12  are controversial, the state argues that those statements "minimized [Jennings'] culpability

13  as to reduce any concern that the declarants were speaking for self-serving motives, rather

14  than merely confessing the truth in a manner that actually helped [Jennings]."

15    In his November 18, 2002 traverse, Jennings reiterates many of the arguments

16  made by his state court appellate counsel in his petition for review before the California

17  Supreme Court.  However, in his supplemental memorandum filed April 3, 2009 after

18  counsel was appointed, and nearly six and one-half years after the filing of his traverse,

19  Jennings further develops his arguments on the issue.  Jennings contends that the

20  evidence against him was "far less compelling" than the evidence inculpating his

21  codefendants.[18]  He contends that aside from his codefendants' statements, the inculpatory

22  evidence tying him to the murder consisted only of his association with the other

23  defendants, his post-offense purchase of his vehicle, and his jailhouse statements to his

24  former girlfriend.

25    Discussing *Lilly*, Jennings contends the codefendants' statements fall into a category

26  that the *Lilly* court expressly condemned.  He argues that the statements constitute

27  ───────────────

28    [18]As noted, the victim's blood was found on Jennings' codefendants' clothing, but not
on his.

54

1   evidence offered by the prosecution to establish the guilt of an accomplice of the declarant,

2   and that here, the codefendants' statements were offered merely to spread the blame for

3   the murder.  Unlike the state, Jennings does not discuss all of the individual statements

4   declarant-by-declarant.  He argues generally that "many" of the statements are not

5   declarations against the declarant's penal interest, and attempts to show inconsistencies

6   that undermine the trustworthiness of the statements.  Jennings also argues that given the

7   pronouns, "we," "us," and "you" used in the statements, the jury likely interpreted the

8   statements to refer to him as well as the declarant(s).

9         In its May 27, 2009 supplemental opposition brief, the state now asserts that "[t]here

10  is no real dispute but that the applicable law is stated in [*Lilly*] and [*Ohio v. Roberts*]."  Brief

11  at 3.[19]  The state argues that Jennings has not demonstrated that the state appellate court's

12  decision was unreasonable in light of *Lilly*.  It asserts that the state court applied the correct

13  law, noting that it did not find that the statements constituted firmly-rooted hearsay

14  exceptions, but instead determined that the statements demonstrated particularized

15  guarantees of trustworthiness in compliance with *Roberts*.  441 U.S. at 66.  Additionally, the

16  state suggests that the court of appeals' findings – including that many of the codefendants'

17  statements were purely self-inculpatory to the declarant, were not blameshifting, and were

18  not an attempt to curry favor – should be presumed correct.  Finally, with respect to those

19  statements that addressed Jennings, the state argues that they were actually exculpatory.

20        **4.    Analysis**

21        The fact that the challenged "statements" actually consist of numerous statements

22  initially presented some difficulty for the court, primarily because the state appellate court

23  did not address each of the statements in a particularly meaningful fashion, but grouped

24  many of them together for purposes of its analysis.  In its papers before this court, the state

25  has broken down the statements, or portions of statements, more narrowly than the state

26  _____

27        [19]As noted, in its November 2, 2002 opposition, the state contended that *Lilly* was not clearly-established law and therefore was not controlling.  However, the state notes that since

28  it filed its opposition brief years ago, the Ninth Circuit has since held that *Lilly* is in fact clearly-established law.  *See Forn,* 343 F.3d at 995 n.4.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1   court of appeal did in its decision, but still does not break them down as narrowly as

2   required for meaningful analysis.

3          As noted, the court finds that several portions of the statements are more

4   problematic than others.  Those include the portions of Spencer 3, Silveria's statement,

5   Travis 1, Travis 2, Travis 3, and Travis 4, that the court has highlighted above.   The court

6   discusses those statements in detail below.  As for Spencer 2, the court has reviewed the

7   record and concludes that Jennings in fact waived any objection to the admission of his

8   codefendants' statements regarding his location during the murder.  The court further finds

9   that the remaining statements including Spencer 1, and the non-highlighted portions of

10  Silveria's statement, Travis 1, Travis 2, and Travis 3 are not inculpatory to Jennings.

11                   **a.      Statement-by-Statement Analysis**

12                          **i.      Spencer 3**

13  Sgt.  Keech:  **Where were you guys first at when, uh, Danny [Silveria] and John**

14                  **[Travis] first started talking about robbing . . . LeeWards?  Do you**

15                  **remember?**

16  Spencer:     **Up in the mountains.**

17  Sgt.  Keech:  **This Uvas?  What did they say?**

18  Spencer:     **That they wanted to hit LeeWards.**

19  Sgt.  Keech:  **And what else did they say?**

20  Spencer:     **That they had to kill him because they knew him, he knew them.**

21  Sgt.  Keech:  **And they had to kill him because he knew them.  Now, how much did**

22                  **you guys plan it out?**

23  Spencer:     **Not very much.**

24  R.T. 6109.

25          In concluding that the above statement did not violate Jennings' Sixth Amendment

26  rights, the state court implied that the statement did not inculpate Jennings, seemingly

27  ignoring the fact that "you guys" could be interpreted by a jury to apply to the group of

28  codefendants as a whole, including Jennings.  The state recognizes the problem in its

United States District Court
For the Northern District of California

1   opposition, but argues that the first use of "you guys" should be interpreted to include only

2   Spencer, Silveria, and Travis.  It thus implies that the statement is only inculpatory to

3   Spencer.  As for the second use of "you guys," the state appears to recognize that this

4   could be interpreted to apply to Jennings as well, but argues that the statement is actually

5   exculpatory since it suggests little planning or premeditation.

6        The state court's ultimate conclusion on a question of law or mixed question of law

7   and fact is reviewed under § 2254(d)(1), but its underlying factual findings supporting that

8   conclusion are entitled to the deference ordinarily afforded factual findings under §

9   2254(d)(2) and (e)(1).   *Lambert v. Blodgett*, 393 F.3d 943, 978 (9th Cir. 2004).  The

10  distinction turns upon the extent to which the challenged decision rests upon subsidiary

11  findings of "basic, primary, or historical facts" as opposed to the application of constitutional

12  principles to those facts.  *Id.* (citing *Thompson v. Keohane*, 516 U.S. 99, 111 (1995)).  In

13  other words, state court findings regarding "what happened" issues typically warrant a

14  presumption of correctness, but its resolution of "ultimate questions" are not entitled to

15  deference.  *Id.*

16       The state court's determination here regarding the inculpatory nature of the

17  statement does not involve subsidiary or "scene-setting" findings.  *See Miller v. Fenton*, 474

18  U.S. 104, 111-12 (1985) (noting that "whether a drug has the properties of a truth serum"

19  and "whether in fact the police engaged in the intimidation tactics alleged by the defendant"

20  constitute subsidiary factual questions).   Instead, determining whether a statement is

21  inculpatory to the petitioner is akin to determining whether a confession is voluntary

22  because it involves the resolution of an "ultimate" question, and is therefore not entitled to a

23  presumption of correctness.  *See id.; see also Thompson*, 516 U.S. at 111 (questions

24  involving a "totality of the circumstances assessment" are not entitled to deference).  The

25  court further notes that in making its findings regarding the inculpatory nature of the

26  statements, the state appellate court did *not* hold an evidentiary hearing at which it

27  appraised witness credibility or demeanor, further suggesting that the findings are not

28  entitled to such a presumption.  *See Thompson*, 516 U.S. at 111.

**United States District Court**
For the Northern District of California

1    This court concludes that both uses of "you guys" in Spencer 3 were likely

2  interpreted by the jury to apply to Jennings, thus making the statement inculpatory to both

3  the declarant and to Jennings.  Moreover, the court disagrees with the state that the latter

4  statement is exculpatory, and finds that it is actually *in*culpatory because it implies that

5  Jennings was part of the group that was aware that the killing was premeditated.  It also

6  implies that some planning  - even if not much - occurred.  Given the fact that the statement

7  may be interpreted to inculpate Jennings, was provided while Spencer was in custody, and

8  that it "spreads" the blame, the court concludes that the state court's decision as to this

9  statement was unreasonable under *Lilly*, and its admission without an opportunity to cross-

10  examine Spencer violated Jennings' rights under the Confrontation Clause.

11                    **ii.       Silveria Statement**

12  Sgt.  Keech:  Again, when did you and John [Travis] first, you know, really plan that you

13                    were gonna do this?

14  Silveria:       Uh, oh, shit, we started getting really ser— couple of months after we worked

15                    there.  Uh, we seen what kind of cash flow came in there.  And I discussed,

16                    you know, and one of these days it would be nice, it would nice, you know, to

17                    do something like this.  Or one of these days we're gonna, you know, we're

18                    gonna rob Jim [Madden], not we're gonna kill Jim [Madden].

19  Sgt.  Keech:  Uh-huh.

20  Silveria:       Just the last couple weeks, the last months he started talking about this.

21                    We'll set him on fire, you know, we'll – we'll cut him, we'll shoot him, we'll do –

22                    we'll shock him, we'll do whatever we have to do and, uh, I wouldn't, I mean,

23                    be on the outside.  I was going, you know, oh, sure, you know, yeah, yeah.

24                    When it came to – when it came time for, you know, him to hand me that

25                    knife, that was the hardest thing I ever did.  I don't know why I did it.

26  Sgt.  Keech:  **When did you guys, uh, decide to do it last night?**

27  Silveria:       **Uh, we were prolonged.  We were gonna do it Sunday night.  Went by**

28                    **and checked it out, it was closed.  *Everybody was gone.  So we decided***

United States District Court
For the Northern District of California

1       **to do it – we – we talked to everybody that was in there and, uh, you**

2       **know what I'm saying, yeah, okay.  We're gonna kill him, we're gonna**

3       **kill him, we're gonna kill him.  Everybody and anybody including me,**

4       **okay?  Okay, fine, we're going [sic] kill him.  When it came down to it**

5       **when I felt we were ready to go, I said, let's go.  I don't know which way**

6       **– he said something inaudible – I don't know if we started walking out**

7       **the building or not, but I just never looked back.  John turned around**

8       **and gave me – he's all, no.**"

9   R.T. 6136-37.

10       This statement is similar to Spencer 3, given its repeated references to "you guys"

11  and "we."  Again, the state court found that nothing in the statement specifically referenced

12  Jennings, including Silveria's use of "we," which the court concluded was reasonably

13  interpreted to refer only to Silveria and Travis.  It thus implied that the statement did not

14  include evidence that was inculpatory to Jennings.

15       The state argues that the fact that Silveria referred to "everybody and anybody"

16  should not be viewed as an attempt by Silveria to "shift" the blame.  It even contends that

17  since Silveria had already admitted that Jennings left the office when the bloodshed began

18  (a statement that is not contested or objected to by Jennings), the above statement

19  somehow also decreased Jennings' blame, and that considering all of Silveria's statements

20  as a whole, the state court's decision was not unreasonable.

21       For the same reasons as those set forth above with respect to Spencer 3, the state

22  court's decision as to this statement was unreasonable under *Lilly*, and the trial court's

23  admission of Silveria's statement without an opportunity to cross-examine Silveria violated

24  Jennings' rights under the Confrontation Clause.  Notwithstanding the state's arguments to

25  the contrary, the highlighted portions of Silveria's statements clearly suggest that Jennings,

26  along with other members of the group, was aware that Madden's murder was

27  premeditated.  This may not constitute an attempt to "shift" the blame, but it is undoubtedly

28  an attempt to "spread" the blame, and is therefore inculpatory to Jennings.

**United States District Court**

For the Northern District of California

1                           **iii.**     **Travis 1 and Travis 2**

2          *Travis 1*

3   Travis:       We started – it all started at Uvas when we all got drunk and got loaded and

4                we decided we wanted some money.  So me and Danny knew there was

5                money in that safe 'cause we used to work there.  So we went over there, all

6                of us went over there and we waited till Jim came out the back door and we

7                rushed him.  And we made him turn off the alarm and then we took his

8                money, then we stabbed him.

9   Sgt.  Keech:  Who stabbed him?

10   Travis:       Chris [Spencer] stabbed him first in the chest and slit his throat. . . .

11   Sgt.  Keech:  and. . . .

12   Travis:       Then I stabbed him.

13   Sgt.  Keech:  And then?

14   Travis:       And then Danny [Silveria] stabbed him.

15   Sgt.  Keech:  *Matt [Jennings] and Troy [Rackley]?*

16   Travis:       *Matt was going to hit him over the head with a crowbar before the*

17                *stabbing.*

18   Sgt.  Keech:  *Never did though, huh?*

19   Travis:       *Never did.*

20   R.T. 6198-6199.

21          *Travis 2*

22   Sgt.  Keech:  **So I mean basically when you went over there, you knew that you**

23                **couldn't leave him alive?**

24   Travis:       **Right.**

25   Sgt.  Keech:  What – what kind of weapon did you have?

26   Travis:       I used Chris' [Spencer's] knife.

27   Sgt.  Keech:  Okay.  But when you went first there?

28   Travis:       I didn't have no weapon.

United States District Court

For the Northern District of California

1  Sgt.  Keech:  Okay.  Chris had a knife?

2  Travis:        **Chris [Spencer] had a knife, *Matt [Jennings] had a crowbar*, Danny**

3              **[Silveria] had the gas which we stuck behind the trailer, and Troy**

4              **[Rackley] had a nail puller.**

5  R.T. 6200-6201.

6      The state court again found that the above statement was inculpatory and against

7  Travis' penal interests.  The court noted that the statement did indeed incriminate Jennings,

8  providing that Jennings was going to hit the victim in the head with a crowbar.  However,

9  given the fact that this statement was followed with Travis' admission that Jennings "never

10 did" hit Madden, the court reasoned the statement as a whole actually minimized Jennings'

11 participation in the crime.  It ultimately concluded that the statement was more exculpatory

12 than inculpatory to Jennings.

13     In his petition for review, Jennings contended that the California Court of Appeal

14 erroneously downplayed the inculpatory nature of some statements with respect to his

15 case, noting specifically Travis' statement that Jennings was going to hit the victim with a

16 crowbar.  Jennings argued that this statement was highly inculpatory to him even though

17 Travis subsequently admitted that Jennings never did actually hit the victim.

18     The state argues that the only portion of the challenged statements that is

19 controversial is the one in which Travis stated that Jennings was going to hit Madden over

20 the head with a crowbar before the stabbing.  The state argues that the statement "only

21 minimally spreads blame for [Madden's] murder" and is trustworthy because it is actually

22 more inculpatory to Travis than Jennings since Travis subsequently admitted that Jennings

23 did not actually hit Madden, and because Travis "identified a potential witness. . . who was

24 less culpable than himself."

25     Again, the court concludes that the state court's decision as to this statement was

26 unreasonable under *Lilly*, and the trial court's admission of Travis 1 and Travis 2 without an

27 opportunity to cross-examine Travis violated Jennings' rights under the Confrontation

28 Clause.   Importantly, Jennings is mentioned by name in these statements, thus there can

United States District Court

For the Northern District of California

1  be no question that Jennings is inculpated in these statements.  Contrary to the state

2  court's findings, the above highlighted statements are also highly incriminating of Jennings.

3  They suggest premeditation in so far as Jennings allegedly brought a weapon to the crime

4  scene, and also suggest that Jennings intended to aid and abet in the crime even if he

5  didn't end up participating in the actual murder.

6             **iv.**    **Travis 3 and Travis 4**

7      *Travis 3*

8  Sgt.  Keech: **Okay.  Now you knew when you went over there last night, you knew**

9                  **that you had to kill Jim?**

10  Travis:      **Oh, oh, definitely.**

11  Sgt.  Keech: It was just a question of how you were going to do it?

12  Travis:      Said [inaudible] Chris [Spencer], he goes, I'll kill him, I'll kill him.  I said all

13                  right.

14      *Travis 4*

15  Sgt.  Keech: **Well, you know before, you knew before you even got there that's what**

16                  **you were going to do?**

17  Travis:      **Right.**

18  Sgt.  Keech: **Now, did — you went over the day before in fact, right?**

19  Travis:      **Yeah.**

20  Sgt.  Keech: **So I mean the bottom line is when you went over there you went to get**

21                  **the money, you knew you had to kill him?**

22  Travis:      **Uh huh.**

23  Sgt.  Keech: **You – you had two missions, one was to get Jim and the other one was**

24                  **to get the money, huh?**

25  Travis:      **Yeah.**

26        The state court did not appear to make any express findings on the above

27  highlighted statements.  However, given its ultimate conclusion, it presumably determined

28  that "you" did not refer to Jennings and/or to the group of codefendants as a whole.

United States District Court

For the Northern District of California

1    Although this statement is not as obviously inculpatory to Jennings as the other highlighted

2    statements, it is unclear whether "you" refers only to the declarant, Travis, or to the group

3    as a whole.  Given the fact that the trial court did not provide limiting instructions regarding

4    the definitions of the pronouns, the court finds that the jury could have interpreted Travis 3

5    and Travis 4 to inculpate the entire group, including Jennings, particularly given that

6    Jennings was on trial alone.  Accordingly, because the statement appears to be an attempt

7    to "spread" the blame in violation of *Lilly,* the trial court's admission of Travis 3 and Travis 4

8    without an opportunity to cross-examine Travis violated Jennings' rights under the

9    Confrontation Clause.

10        In sum, the court finds that the all of the above highlighted statements violated

11   Jennings' Confrontation Clause rights.

**B.    The Admission of the Codefendants' Statements in Violation of the Confrontation Clause was Harmless with Respect to the Felony Murder Special Circumstances because there was Sufficient Other Evidence in Support of those Special Circumstances**

15        However, the determination that the admission of the above statements violated the

16   Confrontation Clause does not automatically warrant habeas relief.  A Confrontation Clause

17   violation is subject to harmless error analysis.  *See Delaware v. Van Arsdall*, 475 U.S. 673,

18   681-84 (1986); *Winzer v. Hall,* 494 F.3d 1192 (9th Cir. 2007); *United States v. Bowman*,

19   215 F.3d 951, 961 (9th Cir. 2000).  A showing of constitutional error under the Sixth

20   Amendment only merits habeas relief if it had a "'substantial and injurious effect or

21   influence in determining the jury's verdict.'"  *Holley*, 568 F.3d at 1100 (quoting *Brecht,* 507

22   U.S. at 637).  Factors to be considered when assessing the harmlessness of a

23   Confrontation Clause violation include the importance of the testimony, whether the

24   testimony was cumulative, the presence or absence of evidence corroborating or

25   contradicting the testimony, the extent of cross-examination permitted, and the overall

26   strength of the prosecution's case.  *Van Arsdall*, 475 U.S. at 684; *Whelchel v. Washington*,

27   232 F.3d 1197, 1206 (9th Cir. 2000) (noting that although *Van Arsdall* involved a direct

28   appeal and not a habeas action, "there is nothing in the opinion or logic of *Van Arsdall* that

United States District Court

For the Northern District of California

1    limits the use of these factors to direct review").

2         Jennings argues generally that the Confrontation Clause violation "resulted in an

3    erroneous conviction," but in his federal habeas briefs he has not sufficiently differentiated

4    between the impact that the Confrontation Clause violation had on his conviction as

5    opposed to the special circumstances findings.  In terms of his conviction, he simply

6    characterizes the codefendants' statements as "the cornerstone of the prosecution's case."

7    The different elements, especially the mens rea requirements, associated with the

8    conviction and the special circumstances necessitate a distinction between the conviction

9    and the special circumstances in assessing the impact of the violation.

10        As noted above, the state presented several theories of first degree murder to the

11   jury, including first degree felony murder, the one that it emphasized in its closing argument

12   was the easiest route for the jury to take in its deliberations.  The jury's verdict does not

13   specify under which theory it convicted Jennings.

14        First degree felony murder was the least stringent of the theories in terms of proof. In

15   order to convict Jennings of first degree felony murder, the state had to prove only that he

16   intended to commit the underlying felony, the robbery and/or burglary in this case, and that

17   the murder occurred during the course of the robbery and/or burglary. *Duncan v. Ornoski,*

18   528 F.3d 1222 (9th Cir. 2008); *see also* C.T. 1910 (CALJIC 8.10); C.T. 1913.  It did not

19   need to prove that Jennings planned or premeditated the murder or that he intended to kill

20   Madden. *Id.* The same is also true of a conviction for aiding or abetting felony murder.

21   *See People v. Cavitt*, 33 Cal. 4th 187, 198 n.2 (Cal. 2004) ("it is no defense to felony

22   murder that the nonkiller did not intend to kill, forbade his associates to kill, or was himself

23   unarmed"); *Beeman*, 35 Cal. 3d at 560-61.

24        The violative statements highlighted above primarily concern Jennings' intent and

25   awareness of a premeditated plan to kill Madden and/or his role in the murder - factors that,

26   based on state law, were not significant to a first degree felony murder conviction.

27   Moreover, Jennings has not challenged the sufficiency of the evidence regarding the

28   elements required for a first degree felony murder conviction, including his intent to commit

United States District Court

For the Northern District of California

the burglary and/or robbery, or the fact that murder occurred during the course of a felony. For these reasons, the court concludes at the outset that the Confrontation Clause violation was harmless with respect to Jenning's conviction.

Instead, the real issue is whether admission of the violative statements constituted prejudicial or harmless error with respect to the special circumstances findings. This issue overlaps with Jennings' challenges to the sufficiency of the evidence supporting the special circumstances findings.

Again, though, given the court's conclusion that Jennings is entitled to habeas relief on other grounds with respect to the lying-in-wait special circumstance, the court finds it unnecessary to consider the sufficiency of the evidence supporting the lying-in-wait special circumstance and the related issue of the role that the Confrontation Clause violation had on the lying-in-wait special circumstance finding. The court therefore limits its analysis below to the sufficiency of the evidence and the impact of the Confrontation Clause violation on the felony murder special circumstances.

### 1.   Parties' Arguments

Again, because the parties failed to adequately develop the arguments in their briefs before this court, including those briefs prepared by Jennings' counsel, the court was required to review the state court appellate briefs to fully comprehend their arguments on these issues.

### a.   Sufficiency of the Evidence

Jennings argued before the state court of appeal that the evidence was insufficient to establish that he was a "major participant" and that he acted with "reckless indifference to human life" with respect to the felony murder special circumstances. Regarding his participation, Jennings contended that the evidence established that Travis and Silveria were the ringleaders, and there was no evidence that he had any role in planning the robbery, carrying the weapons actually used in the robbery and murder, or that he played any role other than lookout and getaway driver. He asserted that he had virtually no interaction with the victim, and did not exercise any control over the robbery.

**United States District Court**

For the Northern District of California

1    As for his culpability, Jennings argued that the prosecution also failed to show that

2    he demonstrated a "reckless indifference to human life," contending that there was no

3    evidence that he was ever armed with a murder weapon, that he supplied the murder

4    weapons to the actual killers, that he knew of or advised the killing of the victim, or that he

5    was even present at the time of the killing.  He further asserted that the evidence

6    demonstrated that he did not participate in any injury to the victim, let alone the killing.

7    In opposition, the state contended that whether Jennings possessed "reckless

8    disregard" and was a "major participant" was moot because the jury in fact found that

9    Jennings possessed an intent to kill given that it found true the lying-in-wait special

10   circumstance, which required an actual intent to kill.  The state then argued that "far more

11   than substantial evidence supported the finding that [Jennings] intended the killing of the

12   victim Madden."  First, the prosecution showed the clear premeditated and deliberated plan

13   of attack on the store and the store's manager, the victim.  It asserted that the plan of

14   attack was shown by "numerous pieces of direct evidence."  Second, the state asserted

15   that the prosecution then tied Jennings into the knowledge of the plan.  It acknowledged

16   that "the bulk of the evidence so linking [Jennings] was circumstantial," but contended that

17   "it was no less convincing than the direct evidence of the plan itself."

18   Regarding the premeditation of Madden's murder, the state pointed to:  (1) the

19   codefendants' statements; (2) the fact that Silveria and Travis worked at the store together

20   thus suggesting that they knew they would need to kill the victim; (3) evidence that gasoline

21   had been syphoned for burning down the store; and (4) Cynthia Tipton's testimony that

22   Standard had told her that he knew the codefendants had planned the murder in advance.

23   R.T. 5667, 5668, 5669.  Regarding Jennings' personal knowledge of the plan to kill

24   Madden, the state pointed to: (1) the tight relationship between the codefendants; (2) the

25   fact that Jennings had bragged about stun gun robberies; and (3) witnesses observed

26   Jennings with a stun gun.

27   Before this court, the state asserts – in arguments that are lifted almost verbatim

28   from its opposition brief before the California Court of Appeal regarding Jennings' intent to

United States District Court

For the Northern District of California

1    kill -- that there is sufficient evidence of Jennings' reckless indifference and major

2    participation.

3         In his supplemental brief before this court, Jennings simply argues that there was

4    insufficient evidence to demonstrate that he possessed "reckless indifference for human

5    life" and was a "major participant" in the felony.  He notes that there was no evidence that

6    he was armed or carried a murder weapon, supplied the weapon, or that he was even

7    present at the time of the killing.

8              **b.      Harmless Error - Confrontation Clause**

9         In his opening brief before the California Court of Appeal, Jennings argued that he

10   was prejudiced by the trial court's admission of his codefendants' statements because the

11   statements were admitted for all purposes, including guilt, and without a limiting instruction.

12   He noted that in its closing arguments, the prosecution actually emphasized the most

13   damaging of the statements, including Travis' statement that Jennings was supposed to hit

14   Madden over the head with a crowbar, and even suggested that Jennings may have hit

15   Madden with it.  R.T. 6399, 6377.  Jennings argued that the codefendants' statements were

16   the only evidence from which the jury could have found the special circumstances to be

17   true.

18        In its opposition, the state argued that even if the trial court erred in admitting the

19   codefendants' statements, there was no prejudice given the other evidence regarding

20   Jennings' participation in the murder.  It noted that the "key issue was the extent of

21   [Jennings'] prior knowledge of the murder plot," and argued that there was sufficient

22   evidence in addition to the codefendants' statements.  In support it argued: (1) that

23   Jennings was a vocal and leading member of the gang; (2) he knew that Silveria and Travis

24   knew Madden, making a robbery without disguises highly likely to result in a murder; (3) he

25   knew the effects of the stun gun and the likelihood that it would be used; (4) Standard

26   testified that Jennings participated in the discussions re: the robbery; and (5) Tipton

27   testified that Standard told her that he knew the defendants were planning a murder.  In

28   sum, the state argued that "[w]hile the statements by the codefendants were very damaging

United States District Court

For the Northern District of California

1   to [Jennings], it cannot be reasonably stated that, given the broad range of evidence

2   against [Jennings], a different result would have been likely even in the absence of the few

3   portions of the statements on which the question of admissibility was somewhat close."

4        In his petition for review before the California Supreme Court, Jennings argued that

5   the court of appeal erred in concluding that any error was harmless because the evidence

6   that it cited in support was "patently insufficient to support a special circumstances finding

7   for [Jennings] as an aider and abettor."  He argued that the evidence referenced by the

8   state court was actually *exculpatory* to the special circumstances.

9        In its opposition to Jennings' petition before this court, the state, while conceding

10  that "the codefendant confessions . . . were powerful," nevertheless argues that their

11  admission was not prejudicial under *Brecht*, 507 U.S. at 619.  Oppos.  at 29.  In support,

12  the state argues that "numerous witnesses made it crystal clear that [Jennings] was present

13  at the scene for the lengthy lying-in-wait period and for the crime itself," and cites to

14  testimony from Jennings' ex-girlfriends.  Carlino, R.T. 6002, 6027 et seq.; Ruth Summers,

15  R.T. 6055.  The state also argues that there was evidence that Jennings knew that Madden

16  was present in the store at the time of the robbery, and also that the tires on Madden's

17  truck had been slashed to eliminate his escape.  R.T. 6027.

18       In his supplemental traverse, Jennings argues that the codefendants' statements

19  constituted the prosecution's main evidence given the lack of eye witness testimony and

20  asserts that they therefore cannot be harmless.

21              **2.        State Appellate Court's Decision**

22       As for the Confrontation Clause claim, the state appellate court held that even if the

23  trial court erred in admitting the codefendants' statements under *Lilly*, 527 U.S. 116, the

24  error was harmless under *Chapman v. California*, 386 U.S. 18, 24 (1967).  In support, it

25  primarily cited to evidence linking Jennings to the codefendants and the robbery and the

26  planning of the robbery, including the use of a stun gun.  The appellate court concluded

27  that this evidence, in combination with the unchallenged portions of the codefendants'

28  statements, "clearly showed [Jennings'] participation in the crimes of which he was

68

United States District Court

For the Northern District of California

1 | convicted."

2 |       As for the felony murder special circumstances, because it resolved all of the special

3 | circumstances issues - including the felony-murder special circumstances - on a

4 | determination that the jury properly found sufficient evidence of Jennings' intent to kill, the

5 | state court did not address whether there was sufficient evidence of reckless indifference

6 | and major participation on Jennings' part.

### 3.    Legal Standards

8 |       The Due Process Clause "protects the accused against conviction except upon proof

9 | beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

10 | charged." *In re Winship*, 397 U.S. 358, 364 (1970).  A state prisoner who alleges that the

11 | evidence in support of his state conviction cannot be fairly characterized as sufficient to

12 | have led a rational trier of fact to find guilt beyond a reasonable doubt therefore states a

13 | constitutional claim, *see Jackson*, 443 U.S. at 321, which, if proven, entitles him to federal

14 | habeas relief.

15 |       When a state court has considered a sufficiency of the evidence claim, AEDPA

16 | requires a federal habeas court to afford an additional degree of deference to the state

17 | court's decision.  Consequently, habeas relief is not warranted unless "the state court's

18 | application of the *Jackson* standard [was] objectively unreasonable." *Juan H. v. Allen*, 408

19 | F.3d 1262, 1275 n. 13 (9th Cir. 2005).  A federal habeas court must look to state law to

20 | establish the "essential elements" of the offense, and then turn to the federal question of

21 | whether the last-reasoned state court decision was objectively unreasonable in concluding

22 | that sufficient evidence supported the conviction pursuant to the standards set forth in

23 | *Jackson* and *Winship*.  *See Briceno v. Scribner*, 555 F.3d 1069, 1078 (9th Cir. 2009); *Allen*,

24 | 408 F.3d at 1274.

25 |       A federal court reviewing collaterally a state court conviction "determines only

26 | whether, 'after viewing the evidence in the light most favorable to the prosecution, any

27 | rational trier of fact could have found the essential elements of the crime beyond a

28 | reasonable doubt.'"  *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992) (quoting *Jackson*,

United States District Court

For the Northern District of California

1  443 U.S. at 319).  In evaluating the evidence under *Winship* and *Jackson*, the court should

2  take into consideration all of the evidence presented at trial.  *LaMere v. Slaughter*, 458 F.3d

3  878, 882 (9th Cir. 2006) (in a case where both sides have presented evidence, a habeas

4  court need not confine its analysis to evidence presented by the state in its case-in-chief).

5  If confronted by a record that supports conflicting inferences, a federal habeas court "must

6  presume – even if it does not affirmatively appear on the record – that the trier of fact

7  resolved any such conflicts in favor of the prosecution, and must defer to that resolution."

8  *Jackson*, 443 U.S. at 326.

9                              **4.    Analysis**

10        As noted above, the state appellate court resolved all of the special circumstances

11  issues - including the felony murder special circumstances - on a determination that the jury

12  found sufficient evidence of Jennings' intent to kill.  The verdict forms do not reveal whether

13  the jury found reckless disregard and major participation with respect to the felony murder

14  special circumstances - as opposed to intent to kill, and given the lying-in-wait jury

15  instruction error, it is unclear what findings the jury actually made regarding Jennings' intent

16  with respect to the special circumstances.

17                          a.    *Intent to Kill*

18        However, assuming that a reviewing court disagrees with this court's analysis of the

19  jury instruction issue and also concludes that the state appellate court reasonably

20  determined that the jury properly found that Jennings possessed intent to kill with respect to

21  the lying-in-wait special circumstance such that it could also apply to the felony murder

22  special circumstances, this court concludes that admission of the codefendants' statements

23  in violation of the Confrontation Clause constituted prejudicial error with respect to *any*

24  intent to kill finding, regardless of whether it applied to the murder conviction, the lying-in-

25  wait special circumstance, or the felony murder special circumstances.  The strongest, and

26  nearly the *only* evidence that Jennings was aware of a plan to kill the victim came from his

27  codefendants' statements.

28        The only other evidence that Jennings was aware of a plan to kill Madden came via

70

1   Tipton's testimony.  Tipton, who was a neighbor of Jennings, testified that Standard,

2   another neighbor of Jennings,' who lived with Tipton at the time, told her that Jennings and

3   his codefendants discussed not only the robbery in Standard's presence - but also

4   discussed the fact that they would have to kill Madden.  R.T. 5668.  Tipton testified that

5   Standard told her this after she heard about the robbery and murder in an attempt "to

6   comfort" her.  *Id.*  Tipton attested that Standard confided in her that he was worried

7   because he knew something about it but hadn't done anything.  *Id.* at 5669.

8        However, Standard, who also testified for the prosecution, denied making any such

9   statement to Tipton.  In both his statements to police in July and August 1991, and on

10  cross-examination by defense counsel at Jennings' trial on April 17, 1997, Standard

11  testified that although he overheard the defendants planning the *robbery* on at least two

12  occasions, he never overheard the defendants planning to murder the victim.  R.T. 5481,

13  5492.[20]

14       Given Tipton's serious credibility issues, as highlighted before the jury,[21] combined

15  with the fact that Tipton's testimony regarding Standard's alleged statements was

16  contradicted by Standard himself who testified consistent with his statements to

17  investigators immediately after the murder, it is unlikely that the jury would have relied on

18  Tipton's testimony alone, along with the other weak circumstantial evidence of Jennings'

19  intent to kill, to conclude that Jennings personally intended to kill Madden.  Instead, the

20  codefendants' statements were the centerpiece in the prosecution's case with respect to

21  Jennings' alleged intent to kill.

22       In sum, after considering the relevant factors -  the importance of the testimony,

23  whether the testimony was cumulative, the presence or absence of evidence corroborating

24  or contradicting the testimony, the extent of cross-examination permitted, and the overall

25

26       [20]Standard also testified that he never liked Jennings, and had called him names in the
    past.  R.T. 5481.  He further attested that there was a great deal of animosity between Tipton
27  and Jennings as well, and that Jennings was not welcome in Tipton's home.  *Id.*

28       [21] The jury was made aware of the fact that Tipton was a drug addict and had proven
    unreliable in the past.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1   strength of the prosecution's case – the court concludes that the codefendants' statements

2   were absolutely critical to any finding that Jennings possessed an intent to kill, and their

3   admission would not have been harmless with respect to such a finding.  *See Winzer v.*

4   *Hall*, 494 F.3d 1192, 1195, 1201-1202 (9th Cir. 2007) (finding that the erroneous admission

5   of victim's statements through police officer's testimony had a substantial and injurious

6   effect on the jury's verdict because the hearsay statement was the only evidence of

7   petitioner's gesture while making a threat, so it was the only proof of the petitioner's "gravity

8   of purpose," a necessary element of the offense).

9       However, as discussed, the felony murder special circumstances did *not* require an

10   intent to kill.  Therefore, it is possible that the admission of the codefendants' statements

11   was nevertheless harmless with respect to those special circumstances if there was

12   sufficient evidence *other* than the violative codefendants' statements by which the jury

13   could have found that Jennings acted as a major participant with reckless indifference for

14   human life.

15      As noted, the state appellate court did not address whether there was sufficient

16   evidence of reckless indifference and major participation on Jennings' part.  Following its

17   requisite independent review of the record, *see Delgado*, 223 F.3d at 981-82, the court

18   concludes that there was sufficient other evidence that Jennings acted as a major

19   participant with reckless indifference for human life.  Although the jury would likely have

20   relied on the codefendants' statements in part in assessing Jennings' reckless indifference

21   and participation, there was sufficient other evidence such that any error was harmless.

                                b.   *Major Participant*

23      A "major participant," within the meaning of California Penal Code § 190.2

24   constitutes an active participant in the planning or carrying out of the crime, that is, "an

25   individual whose conduct involves the intentional assumption of some responsibility for the

26   actual successful commission of the crime, regardless of whether the crime is ultimately

27   successful." *People v. Hearn*, 116 Cal. Rptr. 2d 298 (Cal. Ct. App. 2002).  Participation in

28   planning with the intent of facilitating the commission of the crime, or participating in

**United States District Court**
For the Northern District of California

1    conduct integral to or for the purpose of facilitating the commission of the crime, constitute

2    major participation.  *Id.*

3           In *People v. Proby*, the California appellate court rejected the *Proby* defendant's

4    dictionary definition of "major," under which he claimed a common understanding of the

5    word required his role be "greater in dignity, rank, importance, interest, number, quantity or

6    extent."  60 Cal. App. 4th 922, 930-31 (Cal. Ct. App. 1998).  Instead, the court noted that

7    the common meaning of "major" also includes "notable or conspicuous in effect or scope"

8    and "one of the larger or more important members or units of a kind or group."  *Id.*  In

9    applying this less restrictive common understanding of the phrase, the court concluded that

10   sufficient evidence supported a finding of major participation where the defendant provided

11   the actual shooter with the gun used to commit the murder, saw the victim after he was

12   shot but made no attempt to assist him or determine if he was dead or alive, proceeded to

13   the safe, took money from it and left the store.  *Id.*  The court held that the fact that a

14   defendant did not witness the actual killing during the robbery did not necessarily lead to a

15   conclusion the evidence was insufficient to support findings he was a major participant.  *Id.*

16   at 929-30.

17          In other cases, the California Court of Appeal has found similar involvement to

18   constitute "major" participation.  In *People v. Bustos*, the court found sufficient evidence

19   supported the special circumstance allegation against a codefendant who did not actually

20   attack the victim, where the codefendant had committed prior robberies with the attacker,

21   planned the charged robbery with the attacker and fled the scene with the attacker and the

22   loot, leaving the victim to die.  23 Cal. App. 4th 1747, 1755 (Cal. Ct. App. 1994).  In another

23   case, the defendant was also found to be a major participant where the evidence showed

24   he did not intend for the victim to be killed by his accomplice, but he had arranged the

25   accomplice's entry into the victim's house and, once the victim was shot, the defendant

26   carried through with the robbery, leaving the victim there to die and threatening the

27   remaining victim.  *People v. Mora*,  39 Cal. App. 4th 607, 617 (Cal. Ct. App. 1995).

28          Recently, in *Hearn*, the California Court of Appeal reaffirmed that the term "major

73

United States District Court

For the Northern District of California

participant" is not so narrowly defined as to require the defendant's involvement to be somehow greater than that of his co-participants. 116 Cal. Rptr. 2d at 298. However, the court emphasized that it is "equally clear that a major participant must do something more than merely aid and abet in the crime or else the special circumstances requirement would have no meaning separate from the felony murder rule." *Id.* It noted that a common thread in the cases finding sufficient evidence of major participant involvement to support the special circumstance was that the participants found to be "major" all were people directly involved in the commission of the felony. They were at the crime scene, and somehow had a planned role in, or had helped to effect, the successful completion of the underlying felony. *Id.*

The *Hearn* court held that "major participant" is not limited to a leadership role. *Id.* Rather, "major participant" connotes an active participant in the planning or carrying out of the crime. *Id.* While one can aid and abet the commission of a crime without participating in the actual planning or commission of the crime, a "major participant" is an individual whose conduct involves the intentional assumption of some responsibility for the actual successful commission of the crime regardless of whether the crime is actually ultimately successful. *Id.* Thus, participation in planning with intent of facilitating the commission of the crime, or participating in conduct integral to or for the purposes of facilitating the commission of the crime (such as driving a getaway car or acting as a lookout) would constitute major participation. *Id.* It further distinguished a "major participant" from a simple "aider and abettor" holding that for purposes of a finding of "major participation," the act constituting aiding and abetting would have to be conduct integral to the crime, even where the defendant did not directly and actively commit the act constituting the crime. *Id.* It noted that for example, a lookout or getaway driver could be a "major participant" despite the fact they may never, for example, enter the liquor store. *Id.* Likewise, one who planned or orchestrated the commission of the crime but was not present could potentially be a "major participant." *Id.*

Here, it is true that some of the violative codefendants' statements concern

74

United States District Court

For the Northern District of California

1   Jennings' role in the crime.  However, the court finds that there was other sufficient

2   evidence by which the jury could have found that Jennings participated in conduct "integral

3   to or for the purpose of facilitating the crimes."  There were several witnesses who testified

4   to Jennings' participation in the planning of the robbery, and he admitted to his ex-

5   girlfriends that he waited outside during the robbery, acting as a lookout for the other

6   defendants.  Moreover, there was evidence that Jennings had played an important role in

7   other robberies committed by the same group and/or group members, allowing the jury to

8   infer that he played a similar role in this robbery.

9                              c.    *Reckless Indifference*

10           In *Tison,* the Supreme Court held that it did not doubt that there are some felonies

11  as to which one could properly conclude that *any* major participant necessarily exhibits

12  reckless indifference to the value of human life.  481 U.S. at 158 n. 12.   It further

13  concluded that even in cases where the fact that the defendant was a major participant in a

14  felony did not suffice to establish reckless indifference, that fact would still often provide

15  significant support for such a finding.  *Id.*

16           Subsequently, in *Estrada*, the California Supreme Court clarified the meaning of the

17  statutory phrase "reckless indifference to human life" as set forth in § 190.2(d).  11 Cal. 4th

18  at 572.   *Estrada* involved two defendants who were convicted of committing first degree

19  murder during the commission of a robbery and burglary.  *Id.* The two defendants were

20  sentenced to life without the possibility of parole, and their sentences for the robbery and

21  burglary convictions were stayed by the trial court.  *See id.* at 573.  The *Estrada* court held

22  that *Tison* "instructs that the culpable mental state of 'reckless indifference to life' is one in

23  which the defendant 'knowingly engage[es] in criminal activities known to carry a grave risk

24  of death,' and it is this meaning that [the California Supreme Court] ascribe[s] to the

25  statutory phrase 'reckless indifference to human life' in section 190.2(d)."  *Id.* at 577.   In

26  other words, "reckless indifference to human life" means that a defendant subjectively

27  appreciated that his or her participation in a felony created a grave risk to human life.  *Id.* at

28  581.

United States District Court
For the Northern District of California

1    Here, there was sufficient evidence other than the codefendants' statements that

2  Jennings knowingly engaged in the robbery and burglary, with an appreciation that the

3  crimes carried a grave risk of death.  Numerous witnesses testified that Jennings

4  participated in the planning of the robbery, there was evidence that the defendants planned

5  to use a stun gun in the robbery, and that Jennings went with the codefendants to the

6  scene of the crime, several of whom were armed with weapons.  This evidence was

7  sufficient for a jury to conclude that Jennings possessed a "reckless indifference for human

8  life."

9    Because there was sufficient evidence other than the violative codefendants'

10  statements from which a jury could have determined that Jennings was a "major

11  participant" who exhibited "reckless indifference," the Confrontation Clause error was

12  harmless with respect to the felony murder special circumstances.

13                                    **CONCLUSION**

14    For the reasons set forth above, the court GRANTS IN PART AND DENIES IN

15  PART Jennings' habeas petition.  The court GRANTS relief on Jennings' claim that CALJIC

16  8.80.1 violated his due process rights.  The court, however, DENIES relief on Jennings'

17  claims that the admission of bragging evidence violated his due process rights; that the

18  lying-in-wait special circumstance was unconstitutionally overbroad; that the trial court's

19  admission of his codefendants' statements prejudicially violated his Confrontation Clause

20  rights with respect to the murder conviction and felony murder special circumstances

21  findings; and that there was insufficient evidence to support the felony murder special

22  circumstances findings.

23    Even though the court grants relief on Jennings' jury instruction claim, the court

24  notes that such relief appears to have no effect on Jennings' sentence.  The version of §

25  190.2(a) in effect at the time of the murder in this case provided that "[t]he penalty for a

26  defendant found guilty of murder in the first degree shall be death or confinement in state

27  prison for a term of life without the possibility of parole in any case in which *one* or more of

28  the following special circumstances has been found under Section 190.2, to be true."

1    Accordingly, given the continued existence of the two felony murder special circumstances,

2    Jennings' sentence would appear to remain unchanged by this order.

3          It is unclear to the court whether Jennings is entitled to any relief or further

4    proceedings before the state court to correct and/or vacate the lying-in-wait special

5    circumstance.  The court leaves that determination to the parties.  To the extent that

6    Jennings is entitled to some relief before the state court, such proceedings shall commence

7    within 120 days of the date of this order.

8          The court is also mindful that one or both parties may seek to appeal portions of this

9    order.  It is unclear how Jennings should go about appealing that portion of this order which

10   denies habeas relief while at the same time undergoing proceedings to effectuate the

11   limited grant of habeas relief or the deadline for doing so.  Again, the court leaves that

12   determination to the parties.  However, in accordance with the recent amendment to Rule

13   11(a) of the federal rules governing habeas cases, the court concludes that the order is for

14   the most part "adverse" to Jennings since it does not provide him relief with respect to his

15   conviction or the length of his sentence, and rules as follows regarding a certificate of

16   appealability ("COA").

17         A petitioner may not appeal a final order in a federal habeas corpus proceeding

18   without first obtaining a COA (formerly known as a certificate of probable cause to appeal).

19   *See* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).  A judge shall grant a certificate of

20   appealability "only if the applicant has made a substantial showing of the denial of a

21   constitutional right."  28 U.S.C. § 2253(c)(2).  The certificate must indicate which issues

22   satisfy this standard.  *See id.* § 2253(c)(3).  "Where a district court has rejected the

23   constitutional claims on the merits, the showing required to satisfy § 2253(c) is

24   straightforward: the petitioner must demonstrate that reasonable jurists would find the

25   district court's assessment of the constitutional claims debatable or wrong."  *Slack v.*

26   *McDaniel*, 529 U.S. 473, 484 (2000).

27         Here, the court finds that several issues meet the above standard and accordingly

28   GRANTS the COA as to those issues.  *See generally Miller-El v. Cockrell*, 537 U.S. 322

(2003).  Those issues include Jennings' claims that:

(1) his due process rights were violated by the admission of evidence that he

 bragged about a prior robbery;

(2) the admission of his codefendants' extrajudicial statements violated his rights

under the Confrontation Clause and that any error was prejudicial with respect to his

conviction and the special circumstances findings;

(3)  there was insufficient evidence to support the felony murder special

circumstances findings that he was a "major participant" and that he showed a

"reckless indifference to human life; and

(4) there was insufficient evidence to support the lying-in-wait special circumstance.

If further action is needed by this court in order to effectuate state court proceedings

or appellate review, the parties should notify the court **in writing** within **ten days** of the

date of this order.

The clerk shall send an informational copy of this order to the district attorney of

Santa Clara County, in addition to the usual service on counsel of record.

**IT IS SO ORDERED.**

Dated: June 22, 2010

_____
PHYLLIS J. HAMILTON
United States District Judge